```
            UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF KENTUCKY
                    AT LOUISVILLE
               NO. 3:21-CV-00664-RGJ
```

KARIM CODRINGTON                                    PLAINTIFF


VS.              DEPOSITION FOR PLAINTIFF


OFFICER JAY DOLAK, ET AL.                          DEFENDANTS


                    *** *** ***


DEPONENT:     OFFICER JAY DOLAK


TAKEN:        NOVEMBER 8, 2023


REPORTER:     KIMBERLY M. BALLARD


               MIGLIORE & ASSOCIATES
         COURT REPORTERS AND VIDEO SERVICES
             3704 WOODED SPRINGS COURT
            LOUISVILLE, KENTUCKY 40245
         (502)241-7557    FAX: (502)241-7587
         EMAIL: INFO@MIGLIOREASSOCIATES.COM

1  short day.  So I believe 8:00.
2      Q.    Would that be p.m.?
3      A.    P.m., yes.
4      Q.    Prior to that date -- had you placed anyone
5  in custody prior to the incident of Karim Codrington on
6  that date, August 10, 2018?
7      A.    I don't recall.
8      Q.    Did you conduct any traffic stops that day?
9      A.    I don't recall.
10     Q.    Did you arrest anybody that day prior to
11 coming in contact with Mr. Karim Codrington on that
12 day?
13     A.    I don't recall.
14     Q.    Now I want to talk to you about how you
15 came in contact -- or I should say when you first saw
16 Mr. Codrington on that particular day.
17        Explain to us what you observed when you first saw
18 him.
19     A.    Whenever I saw the car, it was turning into
20 the Thorntons gas station from eastbound Algonquin
21 Parkway.  It had tinted windows.  It pulled up to the
22 westmost pump area, and it parked in an unnormal
23 manner.
24     Q.    And when you say parked in an unnormal
25 manner, explain to us what you mean by that.

```
 1      A.      A manner that if any reasonable person saw
 2   that car parked there, they would think something was
 3   going on.
 4      Q.      What would they think is going on?
 5      A.      Any -- any number of things.  At that time
 6   of day, they would think the driver could possibly be
 7   intoxicated.  They would think the driver could be
 8   casing the business.  They would think the driver could
 9   be having a medical emergency.  They would think the
10   driver could have fallen asleep at the wheel.  They
11   would think the driver wasn't staying there long,
12   maybe.  Any number of things.  It was unnormal.
13      Q.      Could they also think that he was getting
14   gas?
15      A.      In the location where he was parked, a
16   reasonable person would assume that he probably was not
17   getting gas.
18      Q.      So a reasonable person would assume he was
19   not getting gas by the way he was parked?
20      A.      I would believe so.
21      Q.      Would a reasonable person be able to assume
22   that he was on the phone?
23      A.      Potentially.
24      Q.      Would a reasonable person presume that
25   maybe he was going in the store to get some condoms?
```

```
 1        A.      The way he was parked, a reasonable person
 2   would assume that he would have adjusted his vehicle
 3   and not have been sticking out so far to potentially
 4   protrude traffic.  Or if he was getting gas, he would
 5   have backed up and moved closer to the pump.
 6        Q.      Did he protrude -- did he disrupt traffic?
 7        A.      The nose of the car stuck out past the
 8   pumps.
 9        Q.      Did he disrupt traffic?
10        A.      Potentially.
11        Q.      Is that a yes or no?
12        A.      At that time, I don't know.
13        Q.      So we got a car that pulled up -- so the
14   car pulled up.
15        And where were you when you noticed it was coming
16   east down Algonquin?
17        A.      I don't remember my exact location.
18        Q.      Were you in your car?
19        A.      I was.
20        Q.      So were you going west on Algonquin?
21        A.      I don't remember.
22        Q.      It's a possibility?
23        A.      I would say no.
24        Q.      Is it a possibility you were going north on
25   Seventh Street?
```

```
 1      A.     I don't recall.
 2      Q.     Possibility you were going south on Seventh
 3  Street?
 4      A.     I don't recall.
 5      Q.     Possibility you were going west on
 6  Algonquin?
 7      A.     No.
 8      Q.     Is it a possibility you could have already
 9  been in the parking lot?
10      A.     I don't believe so.
11      Q.     So how did you see him coming eastbound on
12  Algonquin?
13      A.     I believe -- I don't remember my exact
14  location.  I believe that I was going southbound on
15  Seventh Street.
16      Q.     So you were going southbound on Seventh
17  Street, and you saw him coming up Algonquin, going
18  towards eastbound.
19             What is it about the car that drew your attention
20  coming eastbound?
21      A.     As it was pulling into the lot, I seen the
22  dark tinted windows and just the color of the car, the
23  dark tinted windows, the niceness of the car, the late
24  night, and it pulled in that way and parked and the way
25  it parked, is what really -- what really struck my
```

```
 1          A.      I don't recall.
 2          Q.      How long were you reviewing -- or should I
 3   say observing?
 4          A.      An extended period of time.
 5          Q.      Two minutes?
 6          A.      I don't know the amount of time.
 7          Q.      Well, would you say it was under four
 8   minutes?
 9          A.      I don't know.
10          Q.      So you said it was -- how long a duration
11   of time?
12          A.      An extended period of time.
13          Q.      What is an extended period of time?
14          A.      Just an amount of time.
15          Q.      Explain that for us what amount of time it
16   is.
17          A.      A lengthy period of time.
18          Q.      What would be a lengthy period of time?
19          A.      A period of time where a reasonable person
20   would assume something would happen and nothing
21   happened.
22          Q.      When you say "something would happen," like
23   what?
24          A.      He would have exited the car.
25          Q.      So when would a reasonable person believe
```

1  someone would exit a car at a gas pump?
2       A.    If they were getting gas, I would assume
3  fairly immediately.
4       Q.    And would immediately -- would that be --
5  describe "immediately."  When they pull up?
6       A.    Whenever I pull up to a pump, I park, and I
7  get out and put gas in the car.
8       Q.    You immediately get out of the car?
9       A.    I do.
10      Q.    So a reasonable person pulls up to a pump,
11 correct?
12      A.    Correct.
13      Q.    And then he or she immediately gets out of
14 the car.
15      A.    I would assume so.
16      Q.    So if a person pulls up to the pump and is
17 there at the pump no more than two minutes, that's a
18 lengthy amount of time for a reasonable person?
19      A.    It would be an indicator, yes.
20      Q.    So you're viewing him from inside your
21 patrol car.  What made you -- did you ever get out of
22 the car?
23      A.    I did.
24      Q.    Prior to you getting out of the car, what
25 did you do?

```
 1   it was a dark tinted window.  And then the first thing
 2   I saw was his arm come up, open up the center console,
 3   throw something in there, and shut it.
 4         Q.     And when you saw him do that, how far were
 5   you from his car when you saw him to do that?
 6         A.     I was standing right next to the window.
 7         Q.     And were his windows up or down?
 8         A.     They were up.
 9         Q.     They were up.
10         And you put -- well, how did you see it if he had
11   tinted windows?
12         A.     I shined my flashlight into the window.
13         Q.     And then what happened next?
14         A.     And there was a spotlight from Detective --
15   or from Officer Blissett's car that shined through the
16   windshield, so it illuminated the car a little better.
17         Q.     So Officer Blissett pulls in front of him
18   and puts the -- what is that light called?
19         A.     A spotlight.
20         Q.     -- a spotlight straight into
21   Mr. Codrington's --
22         A.     In the area of the front of the car, yes.
23         Q.     But it was enough light to go into the car
24   to where you could see?
25         A.     To illuminate the car a little, yes.
```

1   A.      Due to the furtive movement that he made
2  into the center console, due to the way he was parked,
3  he was there for an extended period of time, that level
4  of a gun, it could have been any number of things.
5       It could have been, you know -- like I said, he
6  was potentially casing the business to try to rob the
7  business.
8       Whatever he had thrown in there, I suspected,
9  could have been narcotics; he was there to try to sell
10 narcotics.  That became the main basis of the stop.
11 But, again, in that area, it could have been any number
12 of things.
13  Q.      Well, when you say that area, explain to me
14 about that area.
15  A.      So in that area, there are several strip
16 clubs right down the street.  There are several liquor
17 stores just down the street.  That area is known for
18 violent -- violent crime, narcotics trafficking,
19 prostitution, you name it.  That happens a lot within a
20 mile of -- of that -- that area.
21  Q.      There is also known for the police to get
22 its gas, correct?
23  A.      The gas station, yes, you can get gas at a
24 gas station.
25  Q.      For your division, correct?

```
 1       A.      When we found it, I think I did say that
 2   there was a bottle of liquor -- it was Crown -- it was
 3   Crown Royal, I believe.
 4       Q.      Did you smell any liquor on him?
 5       A.      I don't remember.
 6       Q.      Did you test him with a sobriety test?
 7       A.      I did not.
 8       Q.      So you found out he wasn't there for no
 9   prostitution, correct?
10       A.      I don't know.
11       Q.      Did you ask him?
12       A.      I didn't.
13       Q.      So when you got to the passenger side
14   window, your thoughts were intoxicated, loitering for
15   prostitution.  And the other one was what?
16           I want to make sure it's in your words.
17       A.      The other one was -- could have been,
18   obviously, there waiting to sell or buy drugs.
19       Q.      Selling or buying drugs.
20       A.      Potentially casing the store for a robbery.
21       Q.      Robbery.
22       A.      Or he could have, again -- I believe I said
23   this earlier -- there could have also been a medical
24   issue.
25       Q.      Now, you see me writing on this pad in
```

```
 1   or no?
 2        A.    No.
 3        Q.    Okay.  And I don't want to have to do that
 4   again, because -- just to help us out and communicate,
 5   one of those had to be right because of the word
 6   "predominant," okay?
 7        So back to you would do this all over again the
 8   exact same way.
 9        He's coming down east on Algonquin, correct?
10        A.    Correct.
11        Q.    Could you tell what color the individual
12   driving the car was at that time?
13        A.    No.
14        Q.    And why not?
15        A.    The windows were tinted.  I couldn't tell.
16   It was dark.
17        Q.    So you couldn't tell if -- were you able to
18   see the windshield?
19        A.    I could see the windshield.
20        Q.    Were you able to see the driver?
21        A.    No.
22        Q.    Okay.  All right.  So at what point were
23   you able to actually see the race of the driver?
24        A.    When he rolled down the windows.
25        Q.    Were you able to see his silhouette when he
```

```
 1   man or a Black man.
 2       Q.    Okay.  I don't want to -- I'm not going
 3   to -- I'm not going to pin you like that and go back.
 4   I'm not going to do that to nobody.  I wasn't there.
 5   You were.  You understand what I'm saying?
 6           Was this how you were trained?
 7       A.    I'm sorry?
 8       Q.    Was the way you conducted yourself that
 9   night, is that how you were trained at LMPD?
10       A.    I believe so.
11       Q.    You believe so.
12       A.    I believe so.
13       Q.    You don't know how you were trained?
14       A.    Yes.  I was trained to trust the indicators
15   that you see and to follow that gut feeling.
16       Q.    And they trained you -- LMPD trained you to
17   do exactly what you did that night, correct?
18       A.    To the best of my knowledge, yes.
19       Q.    Have you ever pulled over a Caucasian
20   person, and they told you they had a gun in the car?
21       A.    Yes.
22       Q.    Did you search their car?
23       A.    I can't answer that.  I don't know what --
24   what would have led me to search the car.
25       Q.    Well, if you pull a Caucasian individual
```

1  over, and they said -- they told you there was a gun in
2  the car, correct?
3       A.    Correct.
4       Q.    Did you call the dog?
5       A.    I don't know.
6       Q.    You don't know.
7       A.    I don't know.
8       Q.    Okay.  Did you ever order them out of the
9  car?
10      A.    I asked them to step out of the car, yes.
11 I ask everyone to step out of the car if there's a gun
12 in the car.
13      Q.    I think that's -- I think that should be
14 everybody's practice.
15           Do you think LMPD trained you to have that
16 practice, order everybody out of the car if there's a
17 gun in the car?
18      A.    I can't say that.  I don't know.  I don't
19 know if that was -- I don't remember.  I don't know if
20 that was something in training or if that was just
21 something that -- for me to read the situation.  And if
22 someone said there was a gun in the car, then it just
23 felt better to get them away from the gun.
24      Q.    And, see, I'm not a police officer, and I
25 don't play one.