## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

### NO. 3:21-CV-00665-RGJ

**KARIM CODRINGTON,**                                              **PLAINTIFF,**

**v.**

**OFFICER JAY OLAK, *et al.*,**                                    **DEFENDANTS.**

---

**PLAINTIFF'S MEMORANDUM
IN SUPPORT OF PLAINTIFF'S RESPONSE
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
DATED NOVEMBER 20, 2023 [Doc. 39]
AND OBJECTION TO DISMISSING PLAINTIFF'S CLAIMS**

---

### I. FACTUAL BACKGROUND

This case arises out of the Plaintiff Karim Codrington's unlawful detainment, search, seizure, and arrest on August 10, 2018, by Defendant Louisville Police Officers Tyler Blissett ("Blissett"), Jay Dolak ("Dolak") and John Kirk ("Kirk"). As a result of thereof, Officer Dolak issued two (2) Commonwealth of Kentucky Uniform Citation ("Reports") upon Codrington. In one Report of a citation, Codrington was charged with violating Kentucky Revised Statutes (KRS): (i) KRS 218A.1421 (2) - Traffic In Marijuana, Less than 8 oz - 1st offense; (ii) KRS 524.090 Loitering; (iii) KRS 218A.500(2) Drug Paraphernalia. *First (1st) Uniform Citation*

*Violation Time 12:56 am*, a copy of which is hereto annexed as Exhibit 1. The report of this citation included by reference an LMPD K-9 officer[1]. *Id*.

In the Report of the second citation, Codrington was charged with the following: (i) KRS 523.100 - Tampering with physical evidence; (ii) KRS 218.1415 Possession of controlled substance in first degree. *Second (2nd) Uniform Citation Violation Time 2:33 am*, a copy of which is hereto annexed as Exhibit 2. The report of this citation —DOES NOT— included by reference an LMPD K-9 officer. *Id*.

Codrington was held in a jail cell for at least a day before being arraigned in the Jefferson County District Court, on case, *Commonwealth vs. Codrington, Kriam A.*, Case No: 18-F-014872 and subjected to a $2,500.00 cash bond. *Certified Criminal Court Record*, a copy of which is hereto annexed as Exhibit 3.

On December 5, 2018, the Jefferson District Court held a preliminary hearing concerning the arrest and charges brought against Codrington. *Preliminary Hearing*, a copy of which is hereto annexed as Exhibit 4; Exhibit 3. In that hearing, the prosecuting attorney, the Assistant Jefferson County Attorney, moved the said Court to amend the charges of KRS 218.1415, Possession of controlled substance in first degree, to KRS 218A.1421- Comp Tics, - 1st degree, 1st offense (>= 2 GMS Methamphetamine), KRS 218A.1421 (2) - Traffic In Marijuana, Less than 8 oz - 1st offense, to KRS 218A.1421(2) (A)- ENH Traffic In Marijuana, Less than 8 oz - 1st offense, and KRS 218A.500(2)-

---

[1] Notice that on August 8, 2018, at 1:59 a.m., Officer Blissett referred to the K9 officer as the "*dog*", when he directed Officer Dolak to "Just put the dog in that report" *Dolak body cam*, (Exhibit 14) at 01:06:25. Thus, said in another way, Officer Dolak was directed to list the K9 in one report of the citation — in which they claimed to have formed their basis for their alleged probable cause to search and arrest Codrington for the planted marijuana. Further notice that, the other report of the citation which concerned the alleged meth found in the backseat of Officer Dolak's vehicle while at the LMDC did not occur until 2:28 a.m., twenty-nine (29) minutes later. *Dolak body cam*, (Exhibit 14) at 01:35:18.

ENH Drug Paraphernalia - Buy/Possess to KRS 218A.500(2) Drug Paraphernalia. Exhibit 4. Officer Dolak testified that he based his, along with Officer Kirk's and Officer Blissett's, reasons for conducting the initial stop on the nature of the Thornton gas station and its alleged known use as a drug trafficking area. *Id*. The County Attorney during this hearing, in his case in chief, argued along with other testimony evidence from Officer Dolak, that Codrington was loitering. *Id*.

On August 14, 2019, the Jefferson Circuit Court conducted a hearing in the case *Commonwealth vs. Codrington, Karim A*, Case No: 19-CR-000467, for which Officer Dolak's, Officer Kirk's, and Officer Blissett's actions in stoping, detaining, seizing, and arresting Codrington were challenged. *Suppression Hearing*, a copy of which is hereto annexed as Exhibit 5.

On March 3, 2020, the Jefferson Circuit Court suppressed the alleged evidence that the Defendant Officers Dolak, Blissett, and Kirk alleged to have seized from Codrington on August 10, 2018. Exhibit 3, at p. 46-53.

On November 5, 2020, the criminal action was dismissed by motion of the prosecutor and as a result thereof, all of the criminal charges against Codrington were also dismissed. Exhibit 3.

Between December 7, 2020, and April 19, 2021, once Codrington's criminal case was dismissed, he attempted to retrieve his monies and noticed that a total of at least $18,000.00 was missing, and requested at least once from the LJCMG and the Defendant Officers that his monies be returned, but those request for the return of at least $18,000.00 were denied. Exhibit 3, at p. 3-4.

On April 24, 2021, the Department of Justice ("DOJ"), announced its pattern and practice investigation of the Defendant Louisville Metro Government (Louisville Metro) and its Louisville Metro Police Department (LMPD). *Department of Justice Report*, a copy of which is hereto annexed as Exhibit 6.

Codrington filed this action on November 3, 2021, alleging the following §1983 claims:  *Monell*  alleging that LJCMG and its police department engaged in its unlawful custom, practice and policy for which its police officers and/or their supervisors/agents and/or other employees of LJCMG's police department perform certain acts and/or omissions in connection with traffic stops of African American drivers —in comparison to similarly situated white drivers—  *Complaint,* at ¶¶ 105 – 119,  selective enforcement *Id.,* at ¶¶ 120 – 133, unlawful and unreasonable searches, seizures, and the right to be free from unlawful detention, searches, seizures, and/or arrest *Id.,* at ¶¶ 134 – 151, false arrest *Id.,* at ¶¶ 152 – 156,  malicious  prosecution in which he states that to cover-up their illegal acts, the Defendant Officers provided materially false and misleading, incomplete information and/or omitting material information to the prosecuting agencies for the purpose of having him prosecuted for the said charges levied against him *Id.,* at ¶¶ 157 – 166,  failure to train *Id.,* at ¶¶ 167 – 172, and  fabrication of evidence, in which he states that the Defendant Officers Dolak, Blissett and Kirk knowingly fabricated evidence through out his criminal prosecution to support their stopping, searching, charging, arresting, and prosecution of him *Id.,* at ¶¶ 219 – 225.   Codrington  also  raised  state claims of battery *Id.,* at ¶¶ 173 – 177, false arrest *Id.,* at ¶¶ 178 – 183, malicious prosecution *Id.,* at ¶¶ 184 – 189, negligent supervision and training  *Id.,* at ¶¶ 190 – 197,

negligence  *Id.,* at ¶¶ 189 – 204, trespass and or wrongful taking and or conversion in which he states that the Defendant Officers Dolak, Blissett, and Kirk, acted alone, or in complicity with other and unlawfully took from his possession and carried away at least $18,000.00 totaling in cash  *Id.,* at ¶¶ 205 – 210, and false light. *Id.,* at ¶¶ 211 – 218.

On March 8, 2023, the report of the United States Department of Justice Civil Rights Division and United States Attorney's Office for the Western District of Kentucky Civil Division titled "Investigation of the Louisville Metro Police Department and Louisville Metro Government" ("the DOJ Report") was published. Exhibit 6.

The DOJ Report examined alleged constitutional violations by LMPD that are similar or the same as what Codrington has alleged in his Complaint against the named defendants. Exhibit 6; *Complaint,* ¶¶ , 1–225. The DOJ Report supports a finding that (l) no probable cause existed for Defendant Officers to initiate or extend the stop, and (2) LJCMG knew of and promoted the use of "policies and customs that lead to these unconstitutional stops." The DOJ Report examined "Louisville Metro's and LMPD's own data, many thousands of documents, and thousands of hours of body-worn camera footage" (D.N. 45-1, PageID.193); reviewed a "random sampling" of 190,000 LMPD traffic stops from January 2016 through August 2021 that resulted in a citation or arrest (id., Page ID .223 ); and concluded that there is "reasonable cause to believe that LMPD engages in a pattern or practice of street enforcement that violates the Fourth Amendment. LMPD officers unlawfully stop, frisk, detain, search, and arrest people during street enforcement activities, such as traffic and pedestrian stops." (*Id.*)

Moreover, in support of these findings, the DOJ Report cited multiple incidents of Fourth

(4th) Amendment violations that are similar or the same as Codrington's claims against all of the

named Defendants. (*Id*., PageID.225-26); *Complaint,* ¶¶ , 14–22.

To be more specific, the five (5) sections of the DOJ Report: (1) "EXECUTIVE

SUMMARY" (D.N. 45-1, PageID.192-94); (2)"INVESTIGATION" (id., PageID.200-01);  (3)

"LMPD's Street Enforcement Activities Violate the Fourth Amendment" (id.,

PageID.223-28); (4) "LMPD Unlawfully Discriminates Against Black People in its Enforcement

Activities" (id., PageID.229-44); and (5) "DEFICIENT SUPERVISION AND

ACCOUNTABILITY CONTRIBUTE TO LMPD'S LEGAL VIOLATIONS" (Id.,

PageID.264-71) are closely connected and appropriate to each of Codrington's claims against all

of the name Defendants. (*Id*., at PageID.225-26); *Complaint,* ¶¶ , 14–245.

The undisputed facts are reflected in Codrington's Complaint (Doc. 1 PageID, 1- 45),

depositions of Codrington, *Depo. Karim Codrington*, (October 30, 2023), a copy of which is

hereto annexed as Exhibit 7, Officer Kirk, *Depo. John Kirk*, (October11, 2023), a copy of which

is hereto annexed as Exhibit 8, Officer Blissett, *Depo. Officer Tyler Blissett*, (October 18, 2023),

a copy of which is hereto annexed as Exhibit 9), Officer Dolak, *Depo. Officer Jay Dolak*, with

Exhibits.pdf *(*November 8, 2023), a copy of which is hereto annexed as Exhibit 10, Conrad,

*Depo. Steve Conrad*, (March 14, 2023), a copy of which is hereto annexed as Exhibit 11, the

videos and police reports of Codrington's arrest on August 10, 2018, affidavits, the report of the

United States Department of Justice Civil Rights Division and United States Attorney's Office

for the Western District of Kentucky Civil Division titled "Investigation of the Louisville Metro

Police Department and Louisville Metro Government" ("the DOJ Report") that was published

March 8, 2023 (Exhibit 6), certified public records, statement from top official of the LJCMG and its police department LMPD, videos, and documents related to the criminal prosecution of Codrington and others whom suffered the same or similar constitutional violations as Codrington from the actions and non-actions of LJCMG and its police officers.

### The Complaint

Codrington alleges in his complaint that on August 10, 2018, while he was a thirty-two (32) year old African-American male, United States citizen, driving his Dodge Charger eastbound on Algonquin Parkway, in Louisville, Kentucky, he pulled into the lot of the Thornton's gas station located at the intersection of 7th Street and Algonquin Parkway, an area that is predominantly black, and parked his vehicle adjacent to a gas pump and that is when Officer Dolak drove and parked his marked police cruiser at an angle behind Codrington's vehicle, blocking Codrington's path and Officer Blissett drove and parked his marked police cruiser in front of Codrington's vehicle, blocking Codrington's forward path and had their police cruisers' spotlights directly illuminated on his vehicle. *Complaint,* at ¶¶ 14–19.

Officer Dolak and Officer Blissett exited their police cruisers and simultaneously approached Codrington's parked vehicle and Officer Dolak immediately asked if there were any weapons in the car and Codrington informed him that he had a gun in his car. *Complaint,* at ¶¶ 19 – 22.

At that time, Officer Dolak directed Codrington to exit his vehicle and once Codrington complied with his order, he was immediately pat-down by Officer Blissett and ordered to put his hands on top of his vehicle passenger hood. *Complaint,* at ¶¶ 22 – 25.  During the pat-down,

Officer Blissett entered the pockets of Codrington's clothing and then Codrington was ordered to move from the side of his vehicle to the rear-end of his vehicle. *Complaint,* at ¶¶ 25 – 27.

Officer Dolak asked Codrington if he can go inside Codrington's vehicle and Codrington denied Officer Dolak's request. *Complaint,* at ¶¶ 28 – 29. After refusing to give consent to any searches, Dolak and Blissett further requested that Codrington provide them with his driver operator's license and his Carrying Concealed Deadly Weapon permit, and Codrington complied and then he was ordered to move from the rear of his vehicle to the front of Officer Dolak's police cruiser. *Complaint,* at ¶¶ 30 – 31.

Codrington alleges in his complaint that, when Officer Kirk along with his assigned K-9 officer arrived on the scene, Officer Kirk approached Codrington, and after confirming the validity of the two licenses provided by Codrington, Officer Dolak and Officer Blissett kept requesting permission to search Codrington's vehicle and Codrington kept refusing their requests. *Id.,* at ¶¶ 25, 34.

Codrington alleges in his complaint that, Officer Dolak refused to allow Codrington to produce the insurance card and after being denied many times the consent to any searches Officer Dolak became disgruntle and issued Codrington an ultimatum that if the police officers were not allowed inside the vehicle then they would have to charge Codrington with the traffic violation of —Failure to Produce an Insurance Card. *Id.,* at ¶¶ 35 - 39.

Codrington alleges in his complaint that, Officer Kirk then requested to search Codrington's vehicle with his K-9, and again Codrington refused to consent to any searches. *Id.,* at ¶ 40. Codrington alleges in his complaint that, after Officer Dolak, Officer Blissett, and Officer Kirk were denied consent to search Codrington's vehicle, Officer Kirk initiated, in

accordance to LMPD's custom, at lease two (2) false dog sniffs and that one (1) of the said false dog sniff alerts was conducted by Officer Kirk throwing an object into Codrington's vehicle and causing the K-9 to enter the said vehicle and retrieve the object. *Id.,* at ¶¶ 39 - 42. Codrington alleges in his complaint that, after one of the two false dog sniff alerts was conducted by Officer Kirk, Codrington was then handcuffed. *Id.,* at ¶¶ 39 - 43.

Codrington alleges in his complaint that, after he was handcuffed, Officers Dolak and Kirk searched his vehicle and the belongings within and the said officers discovered a small amount of marijuana and U.S. currency, totaling at least $50,000.00. *Id.,* at ¶¶ 40 - 46. Codrington alleges in his complaint that, after the said officers discovered the small amount of marijuana and U.S. currency, totaling at least $50,000.00 he was then placed under arrest, placed in the back of Officer Dolak's police cruiser and transported to the Louisville Metro Department of Corrections ("LMDC") for process. *Id.,* at ¶¶ 40 - 46.

Codrington alleges in his complaint that, his vehicle was towed by LMPD and impounded and held at the LMPD impoundment lot where it was again searched and then damaged by LMPD or LMDC officers. *Id.,* at ¶¶ 47 - 48.

Codrington alleges in his complaint that, the Defendant Officers issued a Commonwealth of Kentucky Uniform Citation upon Codrington in an attempt to cover-up their illegal actions, and justify the stop, search, arrest, and prosecution of Codrington in which the said citation stated that Codrington was charged with violating Kentucky Revised Statutes (KRS):

> i. KRS 218A.1421- Comp Tics, - 1st degree, 1st offense (>= 2 GMS Methamphetamine);
> ii. KRS 218A.1421(2)(A)- ENH Traffic In Marijuana, Less than 8 oz - 1st offense;
> iii. KRS 524.100 Tampering With Physical Evidence;

        iv. KRS 218A.500(2)- ENH Drug Paraphernalia - Buy/Possess; and

        v. KRS 524.090 Loitering.

*Id.,* ¶¶ 49 - 50.

Codrington alleges in his complaint that, he was transported to the Louisville Metro Department of Corrections and held in a jail cell for at least a day before being arraigned in the Jefferson County District Court, on case Commonwealth vs. Codrington, Karim A., Case No: 18-F-014872 and subjected to a $2,500.00 cash bond. *Id.,* ¶ 51.

Codrington alleges in his complaint that, on August 14, 2019, the Jefferson Circuit Court conducted a hearing in the case Commonwealth vs. Codrington, Karim A, Case No: 19-CR-000467 for which the said Defendant Officers' actions, in charging him with the said crimes were challenged, and Officer Dolak, in accordance to the Defendant City's custom presented false information to further support the unlawful actions of his and his fellow officers prior to, during, and following the stop, seizure, search, arrest, and criminal prosecution of Codrington by falsely asserting that the reason for the stop and search of Codrington was because he had concerns for Codrington's "wellness" in which Codrington was distressed and that the Defendant Officers' proffered reasons for the initial stop, proffered reasons for the search and seizures that followed were false and unlawful. *Id.,* at ¶¶ 52 - 61.

Codrington in his Complaint alleges that, after November 5, 2020, when all of the criminal charges were dismissed and the criminal action was also dismissed he attempted to retrieve his monies and noticed that a total of at least $18,000.00 was missing and Codrington requested from the LJCMG that his monies be returned, but was denied. *Id.,* at ¶¶ 63 - 65.

Codrington in his Complaint alleges that, he had to hire an attorney to appeared before the Kentucky Jefferson County District Court, in the cases Commonwealth vs. Codrington, Karim A., Case No: 18-F-014872 and Commonwealth vs. Codrington, Karim A, Case No: 19-CR-000467, many times in order to defend himself from the criminal prosecution initiated by the Defendants to prove his innocence and that the Defendants, Officer Dolak, Officer Blissett and Officer Kirk knowingly fabricated evidence through out his criminal prosecution in which they fabricated evidence in support of the criminal citation and charges levied against him. *Id., at* ¶¶ 66 and 220.

Codrington in his Complaint also alleges against the Defendants LJCMG, LMPD's former Chief of Police Steve Conrad, Officer (now Detective) Dolak, Officer (now Detective) Blissett and Officer Kirk:  Monell-Related claims of Constitutional Violations Under 42 U.S.C. §1983 against the LJCMG and its police department LMPD declaring that it has the unlawful custom for its police officers to perform the following acts and/or omissions in connection with traffic stops of African American drivers —in comparison to similarly situated white drivers— by:

(i) Preforming pretextual traffic stops in which police officers are performing traffic stops of black drivers more than white drivers to search their persons and property for non-traffic violations, before observing a legitimate traffic violation or having any reasonable suspicion of a drug offense or other non-traffic suspicion violations; (ii) Extending traffic stops of African American drivers absent reasonable suspicion of a drug offense, in order to conduct K-9 (dog) sniffs of the said drivers; (iii) Arresting African American drivers absent probable cause; (iv) Prosecuting African American drivers absent probable cause; (v) Fabricating evidence to support the findings of reasonable suspicion for the stop and search of African American drivers; (vi) Fabricating evidence to support the findings of probable cause for the arrest and prosecution of African American drivers, after targeting, stoping, and searching such drivers because of their race; (vii) Coercing black drivers in agreements to search their persons, vehicle, and/or personal

effects, after the drivers refuse to consent to any searches. (viii) Failing to document required reports of traffic stops as required by LMPD policies; (ix) Generate documentation to cover-up for racially biased policing and the misconduct of police officers; (x) Supervisory individuals from the Defendant City fail to properly discipline officers from the police department that have committed acts of racially biased policing on others; (xi) Supervisory individuals from Defendant City fail to properly investigate complaints of misconduct perpetrated by the Defendant City's police officers, on African American drivers; (xii) Supervisory individuals from Defendant City "Rubber Stamped" investigations of matters involving racially biased policing and the misconduct of its police officers in stoping, investigating, searching, charging, arresting, and prosecuting African American drivers; and (xiii) Supervisory individuals from Defendant City "Rubber Stamped" and/or ignored investigations of matters resulting from its police officers involvement in racially biased policing and the following misconduct of its police officers in prosecuting African American drivers.

*Id.,* at ¶¶ 10 - 13; 106.

Codrington in his Complaint further alleges against the named defendants that, a code of silence exists, between the officers of the Defendant City's police department so as to obstruct the legal process (preventing the free flow of honest information with regard to racially biased policing and acts of misconduct); that LJCMG and Conrad, "Rubber Stamped" the practices and/or customs, as alleged above, by acquiescing to the said customs and practices of the officers and refusing and/or ignoring to conduct proper investigations into the alleged misconduct of its police officers accused of racially biased policing during traffic stops and prosecutions resulting from the stop of black drivers and their passengers; and that Conrad has acted with deliberate indifference and reckless disregard by failing to properly ensure that the wrongful conduct of his police staff is properly investigated and disciplined for committing racially bias policing towards others. *Id.,* at ¶¶ 10 - 13; 107 - 109.

## The Police Reports

After the arrest of Codrington, Officer Dolak's initially created two (2) reports of the Commonwealth of Kentucky Uniform Citations against Codrington on August 10, 2018, the report of one of the citations charged Codrington with violating Kentucky Revised Statutes (KRS): (i) KRS 218A.1421 (2) - Traffic In Marijuana, Less than 8 oz - 1st offense; (ii) KRS 524.090 Loitering; (iii) KRS 218A.500(2) Drug Paraphernalia. Exhibit 1. This report of this citation included by reference an LMPD K-9 dog officer. *Id.*  In this report, Officer Dolak stated that in VIOLATION TIME section the violation occurred at "12:56 AM" and in the TIME OF ARREST section he stated the time of the arrest of Codrington occurring at "1:56 AM" *Id.*

In the Post-Arrest Complaint section, he stated that:

> "Officers observed [Codrington] sitting in the drivers seat of the [the Dodge Challenger]. [The Dodge Challenger] was parked running beside a gas pump at the [Thorntons Gas Station at 2000 7th Street Rd/ Algonquin Parkway, Louisville, KY 40208] for an extended period of time without the driver exiting consistent with the trafficking of narcotics. Upon contact with [the Dodge Challenger] [Codrington] made a furtive movement into his center console before rolling down his windows to speak with officers. [Codrington] freely stated there was a firearm inside the vehicle. Officers called for K9 to perform an outside vehicle sniff. [Officer Kirk and his K9] arrived on scene, performed the sniff at which point the K9 indicated on [the Dodge Challenger]. Further investigation led to K9 indicating multiple times on a brown backpack with a large sum of undetermined US currency. Furthermore K9 also had a positive indication on a black bag in the floorboard containing marijuana individually packaged for sale and a marijuana grinder. Officers were also able to retrieve(*sic*) a Century Arms, AK-47 style, 7.62 mm (serial# RAS47P002721). WVS activated."

*Id.*

Officer Dolak also states in the said report that, "Blissett, OFC T" as witness 1, "Kirk, OFC J", as witness 2. *Id.*

Officer Dolak also states in the said report that there is a "IN-CAR VIDEO" and that there was "EVIDENCE HELD". *Id.*

After the arrest of Codrington, Officer Kirk created a K9 Activity Report ("K9 Sniff Report"). *K9 Activity Report (K9 Sniff Report)*, a copy of which is hereto annexed as Exhibit 12. Officer Kirk's Sniff Report also contains similar language, including the alleged stop of Codrington, the search of Codrington's car and the alleged items to have been found, including the marijuana that is called into question.

In the —Type of Activity— section of the report it Officer Kirk states the following:

K9 Activity: Narcotics

Sub Activity: Vehicle Exterior Sniff

Search Type: Exterior Sniff

*Id*.

In the —Narrative— section Officer Kirk states that:

***Vehicle - Exterior sniff***
K9 team responded to listed location where officers were out on a subject who was loitering(*sic*) on the Thorntons lot. Subject denied consent to search the vehicle. K9 team conducted an exterior sweep of below listed vehicle that the subject was the driver of. K9 Bosco had a change of behavior when walking around the back right bumper of the vehicle. He immediately(*sic*) went to the open door and had a Positive(*sic*) alert with a final response, pointing to a bag sitting on the front passenger seat. Further search of the vehicle K9 alerted on a black bag located under the steering(*sic*) column on the floorboard of the driver seat. Inside the bag on the seat was an unknown amount of US. Currency. Marijuana was recovered from the bag sitting on the floorboard of the driver seat. Bosco also alerted on the center of the dashboard where the subjects cell(*sic*) phone was sitting. Nothing further found on search.

*Id*.

In the —Narcotics Searches— section Officer Kirk states the reasons for the dog alerting was the "Presence of narcotic order", there was narcotics found because of the K9 search, and that the number of locations sniffed was one.

In the —Involved Person— section Officer Kirk states that Codrington "[w]as the

Involved person apprehended by K9 or arrested because of the K9 activity, and that the charges

as the result of the K9 activity were "TIMS under, PDP, Loitering".

*Id*.

In the —Evidences/Articles— section Officer Kirk states:

> Type of item located:
> Narcotics
>
> Item recovered:
> Marijuana, US currency, Rifle
>
> Location where item was found:
> Drivers floorboard in black bag, US currency inside bag on front passenger seat,
> Rifle under front passenger seat

*Id*.

As stated above, after the arrest of Codrington, Officer Dolak's initially created two (2)

reports of the Commonwealth of Kentucky Uniform Citations against Codrington on August 10,

2018, the report of one of the citations charged Codrington with violating Kentucky Revised

Statutes (KRS): (i) KRS 524.100 - TAMPERING WITH PHYSICAL EVIDENCE and (ii) KRS

218A.1415 POSS CONT SUB 1ST DEG, 1ST OFF (METHAMPHETAMINE). Exhibit 2. The

report of this citation —DOES NOT— included by reference an LMPD K-9 officer. *Id*.  In this

report, Officer Dolak stated that in VIOLATION TIME section the violation occurred at "2:33

AM" and in the TIME OF ARREST section he stated the time of the arrest of Codrington

occurring at "2:35 AM" *Id*.

In the Post-Arrest Complaint section, he stated that:

> "Listed subject was being transported to Metro Corrections (see
> citation#CY83507). Enroute to Corrections listed subject began frantically

moving around as if he was making an attempt to remove evidence from his person and conceal it in the backseat of the patrol car. Upon arrival on scene and asking th esuject to step out so that he could enter the jail, officer observed the end of a baggie protruding out of the seat. Upon further investigation the baggie contained suspected methaaphetamine. WVS activated."

*Id*.

Officer Dolak also states in the said report that, "Blissett, OFC T" as witness 1[2],. *Id*.

Officer Dolak also states in the said report that there is a "IN-CAR VIDEO" and that there was "EVIDENCE HELD". *Id*.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank,* 916 F.2d 337, 341–42 (6th Cir.1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

---

[2] Remember that at on August 8, 2018 at 1:59 a.m., Officer Blissett referred to the K9 officer as the "*dog*", when he directed Officer Dolak to "Just put the dog in that report" *Dolak body cam*, at 01:06:25. Therefore, said in another way, Officer Dolak was directed to list the K9 in the report of the first citation — in which they claimed to have formed their basis for the alleged probable cause, but in the report of this citation the K9 was not needed as a witness to form their alleged basis for the alleged probable cause to charge Codrington with the planted meth. *Dolak body cam*, at 01:35:18. Thus, within this context the facts support a finding that the officers planted the meth in the backseat of Officer Dolak's police cruiser all in accordance to stage the event that Codrington had in his possession and control the illegal meth.

matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons–Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir.2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (emphasis added). If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. ARGUMENT

It's all about the $18,000.00 in cash, the ruffle top plastic baggie of marijuana, and the plastic bag of meth. Specifically, it's about the ruffle top practice bag of marijuana alleged to have been found inside a black zipper bag that was found on the driver-side floor board of

Codrington's Challenger and the plastic plastic bag of meth alleged to have been removed from Codrington's "ass" and tucked in between the backseat of Officer Dolak's police cruiser at the jail.

At the moment that officer Blissett and Officer Dolak barricaded Codrington's Challenger, thus preventing him from exiting, that is when the illegal seizure began. The law has been well established for over 30 years that a law enforcement officer doesn't violate the Fourth amendment nearly by: (approaching an individual on the street area to ask him or her if they are willing to answer some questions or (b) Approaching an individual in a public area to ask him or serif they are willing to answer some questions. *See, Florida v. Royer*, 460 U.S. 491, 497 (1983). Such conduct by the police is characterized for Fourth Amendment purposes as being a "consensual encounter" and is not itself a search or seizure. *See, United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007) (characterizing the three types of encounters between police and citizens as being consensual encounters which require no level of suspicion, *Terry* stops which require a reasonable suspicion, and arrests which must be based on probable cause"), *cert. denied*, 552 U.S. 1083 (2007); *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) (discussing the three level of encounters between police and citizens).

In Kentucky and in the rest of the United States of America, *Terry* stops require a reasonable suspicion prior to detaining an individual.

Also in Kentucky, KRS 524.09 (The Loitering Statue), states that [a] person is guilty of loitering when the person:

    (a)  Loiters or remains in a public place for the purpose of gambling with cards, dice, or other gambling paraphernalia, except that the provisions of this section shall not

apply if the person is participating in charitable gaming defined by KRS 238.505, or is engaged in sports wagering licensed under KRS Chapter 230;

(b) Loiters or remains in a public place for the purpose of unlawfully using a controlled substance;

(c) Loiters or remains in or about a school, college, or university building or grounds, not having any reason or relationship involving custody of or responsibility for a pupil or student or any other specific legitimate reason for being there and not having written permission from anyone authorized to grant the same; or

(d) Loiters or remains in any transportation facility, unless specifically authorized to do so, for the purpose of soliciting or engaging in any business, trade, or commercial transactions involving the sale of merchandise or services.

(2) Loitering is a violation.

KRS 525.090 (West)

After Codrington entered the gas station lot he parked his Challenger legally adjacent to the gas pump. Exhibit 10 at 42:19 to 42:23..

As soon as Codrington pulled in to the gas station's lot to get some gas, "within five minutes" he was "surrounded" by Officer Dolak and Officer Blissett. Exhibit 7 at 18:1-25.

The gas station and where the Challenger was parked was well illuminated from the lighting of the gas station. Exhibit 10 at 243: 1-25.

At the Jefferson Circuit Suppression Hearing, when asked how long exactly were he was observing Codrington in his Challenger prior to him and Officer Dolak blocking Codrington in, Officer Dolak testified that he observed Codrington in his Challenger for "approximately five (5) minutes" "give or take".  Exhibit 5 at 00:24:30.

At the Jefferson District Court Preliminary Hearing, Officer Dolak testified that within the five (5) minutes for which he was observing Codrington he did not see anyone approach Codrington's Challenger nor did he see anyone exited Challenger. Exhibit 4 at 00:11:07.

However, at the scene of the arrest, when Officer Kirk asked Officer Blissett and Officer Dolak, where did Codrington "come riding out of?" *Dolak Body Cam*, (01:23:53) at 2:16 am, a copy of which is hereto annexed as Exhibit 14. Officer Blissett claims that he observed Codrington for enough time that he and Officer Dolak rode thought Park Hill, and when he and Officer Dolak arrived to the gas station, he got out of his police cruiser, filed his police cruiser's gas tank with gas, paid for his drinks, came out to the parking lot, sit their and opened his Compels, ate a couple, took a couple drinks, and then concluded that Codrington was Loitering pursuant to KRS 525.090, and then said "plus you know he is crooked, he wasn't even at the pump." *Id*.

Officer Dolak fostered Officer Dolak's said conclusion, by saying Codrington "couldn't even get gas, he was parked way in front of the pump" *Id.*

After the said officers explained their reasoning for their conclusions, Codrington responded by saying "Oh yeah. That I can reach. Actually, I didn't know I was parked that crooked". *Id.*

However, despite that neither of the officer on the scene made statement concerning Codrington's parked Challenger blocking passing traffic, Office Blissett, in his deposition on October 18, 2023, testified that on August 10, 2023, around 12:50 a.m., when Codrington pulled his Challenger into the lot of Thornton's gas station and parked adjacent to the gas pump, Codrington "pulled up so far" that if "cars were going both ways in and out, one car would have

had to have stopped because Karim's car was too far, and that car would have either had to gone around, or vice versa, this car would have had to have waited for this car to go around". Exhibit 9 at 37: 12-20.

Yet, while Officer Blissett's police cruiser is blocking the front of Codrington's car, Officer Blissett's Body Camera video clearly illustrate that a dark-colored vehicle easily passing through between Officer Blissett's police cruiser and the store front of the gas station. *Blissett Body Cam*, (00:32:25) at 1:28am, a copy of which is hereto annexed as Exhibit 15. Officer Dolak's Body Camera clearly shows that, while Officer Blissett's police cruiser was still blocking the front of Codrington's Challenger a grayish colored large size SUV had just passed through and exited the parking lot on the east-side of the gas station. Exhibit 14 at (00:15:43 -15:51) at 1:08 a.m.

As the records reflects, it is clear that the officers did not observed Codrington unlawfully using or was about to unlawfully use a controlled substance. Since neither officers had any reasonable suspicion that Codrington was about to commit a crime or had just committed a crime prior to them blocking in Codrington's Challenger to the point where he could not leave, Officer Dolak and Officer Blissett initiated an unlawful warrantless Terry Stop. Therefore, Codrington did not freely stated there was a firearm inside the vehicle.

Consequently, if  Officer Blissett and Officer Dolak had not barricaded Codrington's Challenger, —thus prohibiting him from freely leaving—, would not have occurred, and then the said officers, along with Officer Kirk would not have conducted an unlawful pat-down, searched Codrington's Challenger, and then they would not have found the fifty-thousand ($50,000.00) in cash, nor would they have planted the drugs on Codrington to cover-up their illegal conduct.

Now, let turn to where the report states that, "Furthermore K9 also had a positive indication on a black bag in the floorboard containing marijuana individually packaged for sale and a marijuana grinder. Notice that Officer Dolak's body camera show that while he is completing the report charging Codrington with the alleged crimes, he request the guidance and instructions of Office Blissett and Officer Kirk. Exhibit 14 at (01:17:13 - 01:26:25 ) at 2:10 am.

Officer Kirk, not one time is heard saying that "marijuana" was found "individual packaged for sale", nor does his K9 Sniff Report. Exhibit 12.
However, Codrington has alway denied that there were any drugs in his car, especially marijuana. Even when Officer Kirk comes to the front of Officer Dolak's police cruiser where the bag of monies is on the hood with a black zipper bag that was alleged to be on the driver side floor of Plaintiff's car. Exhibit 15 at (00:15:23 - 00:15:28)

Although, Officer Dolak states in the report that his body camera was active, "WVS activated",  and at the Jefferson District Court Preliminary Hearing, Officer Dolak testified that he observed Codrington "In car-video was turned back on Defendant and has all the recordings confirming the Officer asked if Plaintiff was ok, because of Defendant's movements while in the backseat. Exhibit 4 at (15:49).

Codrington states that, while he was standing outside of his vehicle by Officer Dolak's police cruiser, he saw that Officer Kirk was searching his vehicle with the K-9, and after one of the officer's left his vehicle's passenger side door open from retrieving his legal firearm from behind the front passenger seat of his vehicle, Officer Kirk and the K-9 entered the passenger side interior area of his vehicle and began to searched within his vehicle downward into the driver side of his vehicle and then Officer Kirk went out of sight. He also states that, while bent

down into his vehicle, Officer Kirk was out of sight for an unusual amount of time to the point I

he they were continuing to be doing something wrong and/or illegal, and the next thing that

happened was that Officer Kirk was calling Officer Dolak over to him where Officer Kirk was

standing in the opening area of the driver side door of his vehicle, when Officer Dolak arrived

over to where Officer Kirk was, Officer Kirk then took his K-9 back to his police cruiser, and

then soon thereafter, Officer Kirk came over to where he was standing and one of the

officers mentions that more marijuana was found and he told the officers that it was not his. *Aff.*

*of Karim Codrington*, Dated December 11, 2023, a copy of which is hereto annexed as Exhibit

13.

      Notice that Officer Dolak also states in the said report that there is a "IN-CAR VIDEO"

      Also notice that while Officer Blissett was escorting Cordrington towards the rear

passenger side of Officer Dolak's police cruiser, Officer Dolak turned the In-Dash Camara

around from facing the front of his LMPD police cruiser to the point that it was facing the back

of his LMPD police cruiser. Exhibit 14 at 00:58:13

      Also take note that at the Jefferson District Court Preliminary Hearing, Officer Dolak

testified that the in car-video camera in his police cruiser was turned facing Codrington, while

Codrington was in the back seat of his police cruiser and that he has all the recordings. Exhibit 4

at 15:49

      However, at his deposition he testified that "he don't know what [that camera] caught or

what that [camera] depicts", that "he did not see that video.", or that he does not know if "there's

a video", but that the "[t]there was a red light on" and that he had "now knowledge of a video",

he even testified that at the although the red light was on, he "never seen any video from that

camera" nor "that doesn't mean that it was recording. It just means the electronic was working to the light" and that he does not "know that that camera really ever recorded", nor that "[t]here was never any videos to download", and that he "never downloaded that camera", he "never saw a video to download, despite that he was responsible for downloading the dash cam videos".

He further testified that, when he attempted to download the video from this In Dash Camera from the night of Codrington's incident on August 10, 2018, he "went to the screen, yes, and there was never a video there. Exhibit 10 at 129 - 168; 251 - 259.

Officer Dolak also states in the said report that there was "EVIDENCE HELD"

However, Officer Blissett testified that no —Search and Seizure Form— was completed and turned in, but Officer Dolak testified that he had the forms filed away in a filed cabinet at his new assigned officer with in LMPD and that pursuant to LMPD's policy at the time of Codrington's monies being sized the —Asset Forfeiture department was supposed to be contacted, but was not. Exhibit 9 at 114: 1 -25; Exhibit 10 at 70:18 to 74:19.

While at the LMPD's property room Officer Dolak and Officer Blissett were the only ones in the property room when a photo was taken that depicted the MCM Back Pack, the black zipper money bank bag, a Century Arms Ak-47 Style Rifle, a drum magazine, a 30 round magazine, a grinder, a ruffled top bag of marijuana, small square bag of marijuana, a baggie of meth, a handgun, a pistol magazine, a larger pistol magazine, and a evidence bag of money. Exhibit 10 at 233:24 to 236:24.  When questioned about the items depicted in the photo, Dolak testified that he recognized the photo and when it was taken, but he did not know where the handgun came from nor who took the photo. *Id.*, at 216:04 to 236:24.

Also notice that Officer Dolak testified in his deposition that he provided the prosecuting attorney in Codrington criminal case the manufactured photo of the false evidence to be used in support of charging Codrington with the criminal charges levied upon him. *Id.*, at 234:08 to 236:03.

Further notice that, the fact that Officer Kirk said that he had a large evidence bag, Officer Blissett reappears in view of Dolak's body camera walking from the driver's side area of Dolak's police cruiser with a plastic evidence bag towards the Challenger along with the MCM bag of money and places both of the items on the rear trunk of the Challenger. Exhibit 14 at 00:44:25. Officer Kirk approached Officer Blissett and they began to converse with each other. *Id.* When Officer Dolak attempted to join Officer Blissett's and Officer Kirk's discussion, Officer Blissett ordered Officer Dolak to stop and to not approach him and Officer Kirk while they were having their discussion. *Id.* Officer Dolak complied with Officer Dolak's order and said "Alright", and he turned the other way and walked to his LMPD police cruiser, and retrieved a notebook from the driver-side sun visor. *Id.* Officer Blissett's police cruiser appears in the back of the Challenger with the headlights on in the video of Dolak's body camera. *Id.*, at 00:44:35. When Officer Dolak returned to the trunk of the Challenger where Officer Kirk and Officer Blissett were standing, Officer Blissett was going through the MCM Bag and removed what they alleged to be the two (2) bags of a small amount of marijuana that were found on the driver's side floor of the Challenger. Then Officer Kirk said to Officer Blissett "Yeah, you are done." "But it has to be above an ounce to try to charge him with trafficking". *Id.*, at 00:44:00.

Moreover, While Officer Dolak was sitting in his LMPD police cruiser with the MGM Bag resting on the passenger seat next to him, Officer Blissett said, "Aye let me get that bag."

*Id.,* at 01:06:25. Officer Dolak reached over and handed the bag to someone outside of his police vehicle. Officer Blissett then said, "So, if you are good with it. It is your stop. I am going to take this with me and not going to turn it in. But, when I leave, when we leave, me and him are going to property and get a picture with the dog." Officer Dolak responded by saying " I am good with it." Officer Blissett then said, "Alright. Just put the dog in that report". Officer Dolak responded by saying "I am good". Officer Blissett then said, "Did he tell you? We got some competition with J-Town (The Jefferson Town Police Department)". *Id., at* 01:06:06 - 01:06:24)

As stated above, after the arrest of Codrington, Officer Dolak's initially created two (2) reports of the Commonwealth of Kentucky Uniform Citations against Codrington on August 10, 2018, the report of one of the citations charged Codrington with violating Kentucky Revised Statutes (KRS): (i) KRS 524.100 - TAMPERING WITH PHYSICAL EVIDENCE and (ii) KRS 218A.1415 POSS CONT SUB 1ST DEG, 1ST OFF (METHAMPHETAMINE). Exhibit 2. The report of this citation —DOES NOT— included by reference an LMPD K-9 officer. *Id*.  In this report, Officer Dolak stated that in VIOLATION TIME section the violation occurred at "2:33 AM" and in the TIME OF ARREST section he stated the time of the arrest of Codrington occurring at "2:35 AM" *Id*.

Prior to August 10, 2018, Officer Blissett and Officer Dolak exchanged their keys to their assigned police cruisers. Exhibit 10 at 141:22 to 141:25.

Notice that Officer Blissett, while searching Codrington's person, he stated to Codrington "You got any tucked in your nuts? Anything tucked in you butt crack? You just up here selling weed?" and Codrington responded  "I don't sell weed." Exhibit 15 at (00:16:36) at 1:12:50am.

To compound matter further, notice that from 00:39:51 to 00:44:24 (4 mins), Officer Blissett was out of his body cam because he turned it off at T05:32:55z/1:32 a.m., the time clock on his body cam which would be at T05:32:45z/1:32am on Dolak's Body cam (Dolak's body cam clock is at least 10 seconds behind Blissett's clock).

After saying that he did not have a large evidence bag, and despite Officer Kirk confirming that he had a large enough evidence bag "right here" on the scene, Officer Blissett still insisted telling Officer Kirk to stay put and ordering Dolak to remain where they were standing so that he can leave the scene and then turn off his body camera and began to stage the next events to fabricate evidence against Codington all in furtherance of the plan to steal Codington's cash. (Exhibit 15 at (00:36:00 - ) at 1:12:50am.

Take notice of the conversation as follows:

> Blissett: "You got currency procedure forms or paper bags?"
>
> Dolak: *Dolak turns his head from left to right indicating the nonstandard response communicating the negative response of* "No" *to a question, and said* "We have to get it when we get down there, when we get to the property room."
>
> Blissett: "We can't it got to go in a bag now."
>
> Blissett now asking Kirk:
>
> "You got a big bag, a currency procedure bag?"
>
> Kirk: "Yeah, a bigger one its right over here." (As Kirk points behind him towards his LMPD SUV K-9 Unit Vehicle.)
>
> Dolak: "If you don't mind we can start writing him."
>
> Blissett: "Um, [pause], I [pause] Yeah, we need a big bag."
>
> Dolak: "Hum."

Blissett:       "We need a big bag, we only got a little one." (*Note: See Dolak's Body Cam at T05:32:33z to see what Dolak's physical activity.*)

Blissett:       "No here, you all stay here, I'll run."

Blissett:       "Jay [Dolak] you stay here I'll run."

Exhibit 14 at 00:36:35 - 00:36:40.

Further notice that at this time at 1:32 a.m., Officer Blissett begins to walk towards his police cruiser and then intentionally shut off his Body Cam. *Id.*, at (00:39:24) at 1:32am.

After Blissett says, "We need a big bag, we only got a little one" *Id.*, at 00:39:26. Officer Dolak starts to turn and walk towards his LMPD cruiser and once he reaches near his driver side door and driver side rear door, Officer Blissett calls out to him and says "Jay [Dolak] you stay here, I'll run". Then Dolak turns around says "Alright" and walks back to Codrington's Challenger's rear end and began questioning Codrington. *Id.*, at 00:40:00.

Notice that at the time stamp of 00:39:58 of Officer Dolak's body camera the brown MCM bag with the cash within is opened and sitting on Officer Dolak's driver seat of his LMPD police cruiser and when Officer Dolak shuts the door he does not lock it. *Id.*, at 00:39:58.

Further notice throughout that said video the red light on the In-Dash Camera in Officer Dolak's LMPD cruiser is illuminated and is facing outwards through the front windshield of the said police cruiser. *Id.*, at 00:43:17.

As Officer Dolak asking Codrington irrelevant questions about his teeth to keep Codrington distracted so that he does not noticing Officer Blissett entering Officer Dolak's police cruiser planting the meth in the backseat of Dolak's police cruiser. *Id.*, at 00:44:00 - 00:44:30.

About four (4) minutes after Officer Dolak left the view of Officer Blissett body cam, the sound of a door is heard closing and then Officer Blissett appears in the view of Officer Dolak's body camera with a plastic bag in his right hand walking away from the driver side rear passenger side of Officer Dolak's LMPD cruiser. *Id*., at 00:44:21 - 00:44:30.

Moreover, even after Officer Dolak excited utterance of saying "There you go!" in which he acknowledges Officer Blissett's return from further setting into motion their plan by planting the meth in the backseat Officer Dolak's cruiser, Officer Blissett still bared him and his body camera from being privy to the conversation being had between him and Officer Kirk by telling him to "hold on a second" when he attempted to join in on the secret discussion being had. *Id*., at 00:44:21 - 00:45:55.

Again, notice that Officer Dolak also states in this said report that there is a "IN-CAR VIDEO"

Despite the fact that while Officer Blissett was escorting Codrington towards the rear passenger side of Officer Dolak's police cruiser, Officer Dolak turned the In-Dash Camara around from facing the front of his LMPD police cruiser to the point that it was facing the back of his LMPD police cruiser. *Id*., at 00:58:13. Most of the time throughout that said video the red light on the In-Dash Camera in Officer Dolak's LMPD cruiser is illuminated and is facing outwards through the front windshield of the said police cruiser. *Id*., at 00:43:17, and the previous testimonies of him stating that he has the recording from this carmrea. Exhibit 4 at 15:49.

He is now claiming that "[t]here was never any videos to download", from his In Car Dash Cam and that he "never downloaded that camera", even after Officer Bilssett stated ,while

at the jail, to Codrington that the cameras were recording. Exhibit 14, at 01:36:23; Exhibit 10 at 129 - 168; 251 - 259.

Officer Dolak also states in the said report that there was "EVIDENCE HELD"

However, this report of the citation has the same issue as the other one, in which while at the LMPD's property room Officer Dolak and Officer Blissett were the only ones in the property room when a photo was taken that depicted the MCM Back Pack, the black zipper money bank bag, a Century Arms Ak-47 Style Rifle, a drum magazine, a 30 round magazine, a grinder, a ruffled top bag of marijuana, small square bag of marijuana, a baggie of meth, a handgun, a pistol magazine, a larger pistol magazine, and a evidence bag of money. Exhibit 10 at 233:24 to 236:24. When questioned about the items depicted in the photo, Dolak testified that he recognized the photo and when it was taken, but he did not know where the handgun came from nor who took the photo. *Id.*, at 216:04 to 236:24. Again to compound matters further, Officer Dolak testified in his deposition that he provided the prosecuting attorney in Codrington criminal case the manufactured photo of the false evidence to be used in support of charging Codrington with the criminal charges levied upon him.  *Id.*, at 234:08 to 236:03.

Further take note that, prior to Officer Dolak transporting Codrington to the LMDC, Officer Dolak and Officer Blissett have the following conversation:

| Officer Dolak: | "You want to go down with me he is bouncing around alot, he might be trying to ditch some more" |
| Officer Blissett: | "He might put something in his ass." |
| Dolak: | "I know, he is bouncing around alot." |

(Exhibit 14 at 01:13:31 at 2:06am)

When Officer Dolak arrives at LMDC with Codrington, Officer Dolak is met by Officer

Blissett. *Id.*, at 01:34:56. Officer Dolak removes Codrington from his police cruiser and orders

Codrington to go take a seat in a chair by the wall. *Id.*, at 01:35:21. When Officer Dolak grabs

the baggie of meth from his backseat he, Officer Blissett, Codrington responded by says the

following:

| | |
|---|---|
| Dolak: | "Hmm, hmm." |
| Blissett: | laughs "Hahaha." |
| Codrington: | "What is that?" |
| Blissett: | (*Starts laughing louder and louder.*) |
| Dolak: | "You got more, listen to me, you got more? You're not listening to me." |
| Codrington: | "You guys searched me before you put me in the car." |

(*Id.*, at 01:36:27)

| | |
|---|---|
| Blissett: | "I did not search your butt crack, I did not check your butt. Guess what the cameras captured your movement." |
| Codrington: | "That is not mine sir. That is not mine. I promise that is not mine" That is not mine." |
| Dolak: | "It is somebodies." |

(*Id.*, at 01:36:49)

| | |
|---|---|
| Codrington: | "Check my DNA, I never touched that bag." |
| Blissett | "I know where it was at! Booty crack!" |

(*Id.*, at 01:39:09)

Notice, that the (1) unlawful warrantless *Terry Stop,* (2) the alleged unlawful possession

of the ruffle top plastic bag of marijuana —despite the small of amount, (3) the alleged unlawful

possession of the plastic bag of meth, along with (3) the lawful possession of a gun and (4) the

lawful possession of at least fifty-thousand dollars ($50,000.00) in cash that formed the basis of

the felony charges that resulted in Codrington spending at least a day in jail, and years defending

against the false charges levied upon him before the Commonweath moved the Jefferson Circuit Court to dismiss the case with prejudice.

Further take note that what is common to both of the Defendants' filed motion for Summary Judgments (Doc. 26;39), and their Reply (Doc. 43), the Defendants argue that regardless, where the drugs were found, it does not matter because, after all, someone eventually found the ruffle top plastic bag of marijuana in Codrington's Challenger and the plastic bag of meth in the back seat of Officer Dolak's police cruiser where Codrington was placed by Officer Blissett, and therefore there was probable cause to arrest and charge Codrington,

However, the Defendants argument misses the point, because there is a clear question of fact as to whether Officer Kirk and/or Officer Dolak planted the ruffle top plastic bag of marijuana in the black zipper bag that was found in Codrington's Challenger as false evidence, whether Officer Blissett planted the plastic bag of meth in the back seat of Officer Dolak's police cruiser prior to putting Codrington in the backseat as false evidence, and whether the said officers stole at least $18,000.00 from Codrington. Codrington told the officers that he had over $10,000.00. (Exhibit 7 at 31:9 - 31:21 ) Officer Blissett states that they found "Like twenty Grand ($20,000) " in Codrington's car. (Exhibit 15 at (28:06) at 1:24:46 am), however on April 15, 2021, LMPD issued Codrington a check for the amount of $31,958.00, without the officer turning in the required Seizure Form. (Exhibit 9 at 114: 1 -25) On April 13, 2021, Codrington filed with the Jefferson Circuit Court an Affidavit, stating that when he was arrested on August 10, 2018, the Officers seized "at least $50,000.00" in cash from him. See Exhibit 3 at p. 3 - 4. Thus, if $31,958.00 was reported to be turned over to LMPD's property room by the officers and if it is noted that the —fabricated— stated amount that the "[l]ike twenty Grand ($20,000)" was

to be found as stated by Officer Blissett being the number that he wanted his body camera to record being said, then within this context the facts support a finding that when added together the amount does in fact totals to like $50,000.00, —the same amount that Codrington was referring to in his Affidavit. *Id*. Moreover, notice that from the time stamp 00:17:34 to 00:17:53 (19 seconds) officer Dolak's body camera, alone with the other facts support a finding that Officer Dolak placed the ruffled top plastic bag of weed within the black zipper bag when he reached down and grabbed the black said zipper bag from the driver's side floor and/or  Officer Kirk had just planted the said evidence at place where Officer Dolak retrieved it and then planted it in the black zipper bag, and when Officer Dolak opened the said bag to show Kirk it was then planted in the bag and Kirk acted as if he was surprised but Kirk knew all along that it was planted. Again, notice that prior to Officer Dolak grabbing the black zipper bag, Officer Kirk was at the same location out of the view of Officer Dolak and Officer Blissett's body cam, but was in the view of the Officer Dolak's In-Car Dash Camera that was not downloaded according to the testimony of Officer Dolak. (Exhibit 14 at 00:17:34 to 00:17:53; Exhibit 10 at 129 - 168; 251 - 259)

Since the probable cause finding was factually questionable, and because there was a direct causal link between the officers lies and Codrington prosecution and incarceration, those lies cannot be considered inconsequential. The Defendant Officer are not entitled to summary judgment because there are questions of material fact as to his liability under section 1983.

### IV. Qualified Immunity re: Blissett, Dolak, Kirk, and Conrad

All four individual Defendants assert that they are entitled to qualified immunity. Under these facts, they are not.

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court held that a state official is protected by qualified immunity unless the Plaintiff shows (1) that the Defendant violated a constitutional right, and (2) the right was clearly established to the extent that a reasonable person in the defendant's position would know that the conduct complained of was unlawful. The Court has also held that qualified immunity " 'provides ample support to all but the plainly incompetent or those who knowingly violate the law.' " *Burns v. Reed,* 500 U.S. 478, 494–95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

In *Higgason v. Stephens,* 288 F.3d 868, 876–877 (6th Cir.2002), the Sixth Circuit set forth a three-part test to determine whether a government official is entitled to the defense of qualified immunity: (1) was there a violation of a constitutionally protected right; (2) was that right clearly established at the time; and (3) has the plaintiff alleged and shown by sufficient evidence that what the official allegedly did was objectively unreasonable?

The Defendant Officers' qualified immunity claim is based on the false premise that their probable cause determination was impregnable, and as such it rests on a foundation lacking the proper strength to support their assertions under the law of this land. The Defendant Officers make much of the validity of the *Terry* stop, but do not discuss the inherent factual discrepancies surrounding Officer Dolak's, Officer Blissett's and Officer's Kirk's claim that the ruffle top plastic bag of marijuana was found in Codrington's Challenger and the bag of was found to have been placed in the backseat of Officer Dolak's police cruiser.

As explained herein above, there is a permitted issue of fact as to whether Defendants Dolak and/or Kirk planted the ruffle top plastic bag of marijuana, and whether Defendants

Blissett planted the plastic bag of meth, all in their efforts to fabricated the accusations about Codrington out of the staged events, with Kirk's encouragement of the K9 and support so that they can steal the monies and have Codrington's Challenger be converted as a detective's car for the LMPD, so it naturally follows that the defense of qualified immunity must necessarily fail as a basis for summary judgment.

The Defendant Officers refuse to address that under the first prong of *Saucier,* the Codrington's constitutional rights were violated. So, to that end, their argument is erroneously focused on the facts that drugs were found, rather than the creating and devising of the false charges that concerned the meth and the ruffle top plastic bag of marijuana.

 With that being said, the facts as shown above brings to light that Codrington should by the narrowest of margins be required to illuminated citation of case laws to put forward as a basis of an argument for which police officers' planting evidence and not being truthful when testifying as the events that occurred in order to —frame— not a suspect, but to, under the color of law, rob an individual is not only a violation of the Due Process Clause, but criminal.

Yet, the Supreme Court, the highest court of our land, did hold perjured testimony knowingly used by the state authorities to sustain a criminal suspect's conviction and deliberate suppression by these same authorities of evidence favorable to him as actions that violates the Constitution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215 (1963) (suppression of exculpatory evidence—., that the police witnesses lied—violates Due Process).

In as much as the Defendants' want to attempt to argue that Codrington's claims in this action stem from an —investigatory stop— in which Codrington was the subject of the investigation, they still are refusing to acknowledge the fact that it wasn't an investigatory stop it

was just a plain out hunting expedition in which the Defendant Officers were using their powers to prey on the innocent of the members of our society to taking "Stacks" from these individuals and keeping the monies as if it was theirs.

Even Officer Kirk identified the Codrington's interactions with the said Defendant Officers as a Traffic Stop. Notice that after being asked for help by Officer Blissett and Officer Dolak in filling out the report of the criminal citation charging Codrington with the manufacture trumped up false charges, Officer Kirk said, "I [*followed by a pausing*]. All you put in there is that, um, K9 responded to the scene, worked with the **traffic stop**, um, probable cause was, um, deemed by the k9" Exhibit 14 at 01:19:45. (*Emphasis added*).

Therefore, it cannot be seriously argued that the right to NOT be deliberately and falsely accused by the police is not clearly established.

The alleged police misconduct in this case falls well outside even the most widest-ranging definition of what one reasonable police officer would remotely seem to be "objective reasonableness." Therefore, the Defendant Officers should not be found to be entitled to qualified immunity.

## V.  PLAINTIFF'S CLAIMS SURVIVE AS A MATTER OF LAW

### a.  *Monell*

Codrington brought federal claims against LJCMG pursuant to *Monell* which allows municipalities to be held liable if their customs violate the Constitution. A municipality may be held liable under section 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *Troutman v. Louisville Metro Dep 't of Corr.,* 979 F.3d 472,489 (6th Cir. 2020) (quoting *City of Canton, Ohio v. Harris,* 498 U.S. 378, 389 (1989)). Municipal

liability "must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff; '[r]espondeat superior or vicarious liability will not attach under§ 1983.'" *Id.* at 489 (quoting *Gray v. City of Detroit,* 399 F.3d 612, 617 (6th Cir. 2005)).

An official policy is "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Colle v. Brazos Cnty., Tex.,* 981 F.2d 237, 244-45 (5th Cir. 1993) (citation omitted).

The Sixth Circuit has noted that

> [u]nder *Monell* and its progeny, ... [a] plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: ... ( l) the existence of an illegal official policy or legislative enactment; (2) that an official with final [decision-making] authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Lipman v. Budish,* 974 F.3d 726, 747 (6th Cir. 2020) (quoting *Burgess v. Fischer,* 478 (6th Cir. 2013)); *see, e.g., Wallace v. Coffee Cnty., Tenn.,* 852 F. App'x 871,875 (6th Cir. 2021).

Here in the case at hand, LJCMG claims that Codrington has not provided sufficient evidence to establish municipal liability under *Monell.* However, Codrington has valid claims to maintain that LJCMG is liable under category four, —(4) the existence of a custom of tolerance or acquiescence of federal rights violations— to achieve municipal liability.

For a Plaintiff, such as Condrington to sustain a claim against LJCMG for a custom of tolerance or acquiescence under *Monell,* Codrington he must show:

(1) the existence of a clear and persistent pattern of[illegal activity];

(2) notice or constructive notice on the part of the [defendant];

(3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

(4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Wallace,* 852 F. App'x at 876 (alterations in original) (citing *Doe v. Claiborne Cnty.,* 103 F.3d 495, 508 (6th Cir. 1996)).

As to meeting the above stated four (4) elements, Codrington, in support thereof, states the following:

### a(i) The Existence of a Clear and Persistent Pattern of an —*Illegal Activity*

Based on the fact that twenty-one (21) minutes before office Dolak noticed Codrington's Challenger entering into the gas station, Officer Dolak had arrived at another traffic stop that was already in progress. A traffic stop was being conducted by Officer Blissett, Officer Kirk, and another LMPD officer. As Officer Dolak approaches the traffic stop of an African American male driver whom the LMPD officer called by name as "Angelo", Officer Dolak's body camera shows Mr. Angelo outside of the Camaro and being guarded by another LMPD Officer at the rear of the Camaro. *Officer Dolak Arriving To The Stop of the White Camaro*, (00:00:00) at 12:22 am, a copy of which is hereto annexed as Exhibit 16, the video evidence of Codrington's encounter with the Defendant Officers on August 10, 2018, that just less than twenty-four (24) hours on August 9, 2018, Tae-Ahn Leaan, an African-American motorist, was

stopped by LMPD officers, and as a result, he had alleged the same violations as the Codrington. (Note: On September 15, 2022, the U.S. Western District Court of Kentucky found that LMPD officers violated the same rights of Mr. Tae-Ahn that Plaintiff has asserted against LJCMG.). *Tae-Ahn Lea v. Steve Conrad, et al.*, Memo. Opin. and Order (September 15, 2022), a copy of which is hereto annexed as Exhibit 17.

Notice in the traffic stop of the  man called "Angelo", As Officer Dolak approaches the traffic stop Officer Blissett and Officer Kirk are seen searching the interior front and back passenger areas of the Camaro. Exhibit 16 at 1:39. Officer Blissett then ordered Mr. Angelo to step away from the rear of the white Camaro and to stand in front of his LMPD cruiser that was parked behind the white Camaro. Then Officer Blissett reached back into the white Camaro and released the trunk latch. Officer Kirk departed from the passenger side door of the Camaro went to the rear of the Camaro and opened the trunk. Officer Blissett departed the driver's side of the said car and went to the trunk, he joined Officer Kirk and began searching the interior area of the trunk. After Officer Blisset and Officer Kirk finished searching the trunk of the Camaro, Officer Blisset and Officer Dolak engaged in a conversation where Officer Bisset asked Officer Dolak, "Have you eaten?" or words to that effect. Officer Dolak responded by saying that "Not if you are out here stopping shit, I ain't eating." Blissett then says: "Dude I had him." Officer Dolak then said, "So, I ain't missing out if he is stopping shit too." Exhibit 16 at 01:50.

Notice that while Officer Dolak is talking to Officer Blissett in his LMPD cruiser, he tells Blissett "I am debating on maybe hunting the north of our beat. I am just not seeing a

whole, … I mean" and then Officer Blissett then exited his LMPD cruiser and walked up to Mr. Angelo and began telling him about the glare on the rear license plate of the Camaro. Exhibit 16 at 03:11 - 04:42

Before Officer Blissett patted Mr. Angelo on his back and released him, he said, "I am going to give you a verbal warning, cool" and then thanked him for his cooperation and told him to "be safe." After Mr. Angelo was released, Officer Dolak told Officer Blissett that he "rolled up Taylor, but [he] didn't see much on Taylor." *Id*. Officer Blissett then said to Officer Dolak "What are you going to do, go eat?", and the following conversation went as follows:

Dolak: "I was gonna go eat and chill but."

Blissett: "We ain't got nothing."

Dolak: "What do you mean?"

Blissett: "We ain't got no stacks."

Dolak: "I know."

Blissett: "We do not need to eat to we get a stack."

Blissett: "We don't need to eat to we get a stack. We just going to starve."

Dolak: "I'll keep hunting, I mean we can go eat whenever."

*Id*.

For at least three (3) minutes Officer Dolak's body camera captured Officer Blissett and Officer Kirk detain and search Mr. Angelo and the Camaro before Mr. Angelo was released to leave with a verbal warning. *Id*.

With these facts along with the DOJ Report, a reasonable jury could find that a clear and persistent pattern of unconstitutional traffic stops, searches, and seizures existed. *See Wallace,* 852 F. App'x at 876 (citing *Doe,* 103 F.3d at 508).

To establish that there is a genuine issue of material fact regarding his custom-of-tolerance-or-acquiescence claim, the DOJ Report concluded that there is "reasonable cause to believe that LMPD engages in a pattern or practice of street enforcement that violates the Fourth Amendment. LMPD officers unlawfully stop, frisk, detain, search, and arrest people during street enforcement activities, such as traffic and pedestrian stops." Exhibit 6, at pp. 32-36.

The DOJ Report's findings were based on the following evidence:

(1) interviews with "LMPD officers and supervisors";

(2) observations of LMPD officers and supervisors "during ride-alongs";

(3) reviews of "LMPD training materials concerning stops, searches, and arrests";

(4) reviews of a "random sampling" of 190,000 traffic stops from January 2016 through August 2021 that resulted in a citation or arrest;

(5) reviews of "body-worn camera footage" for each stop it reviewed as part of the random sampling;

(6) reviews of "dozens of internal affairs investigations and court cases involving stops, searches, and arrests by LMPD officers"; and

(7) interviews of "stakeholders in the criminal legal system, including judges, prosecutors, criminal defense attorneys, and community members." *Id.*

The DOJ Report specifically cites multiple incidents of Fourth Amendment violations. Exhibit 6, at p. 47.

The Sixth Circuit has explained that in "a § 1983 case, evidence of multiple discrete incidents of alleged federal rights violations is relevant for determining whether a municipality has a 'custom' of violating those rights." *Simpkins v. Boyd Cnty. Fiscal Court*, 21-5477, 2022 WL 17748619, at *9 (6th Cir. Sept. 2, 2022) (quoting *Pineda,* 977 F.3d at 495).

### a(ii) Notice or Constructive Notice on the Part of LJCMG

The identification of "those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (emphasis original).

Since February 13, 2003, the LMPD' s Chief of Police is charged with (B) [t]he existing functions, personnel, funds, including capital funds and agencies receipts, equipment, facilities and records of the following departments, agencies, and divisions of the former City of Louisville and Jefferson County governments are transferred to the control of the Chief of the Louisville/Jefferson County Metro Police Department: Louisville Division of Police Jefferson County Police Department;

. . .

(C) The duties, responsibilities and authorities granted to the above designated departments and enumerated in applicable provisions of the Kentucky Revised Statutes, ordinances and resolutions in place pursuant to KRS 67C.115(1), regulations, policies and procedures adopted

by either the Louisville Division of Police or the Jefferson County Police Department shall be deemed transferred to the control and jurisdiction of the Chief of the Louisville/Jefferson County Metro Police Department. *CHAPTER 36: POLICE AND FIRE DEPARTMENTS; AUXILIARY POLICE FORCE louisvillemetro-ky-1* at p. 2, a copy of which is hereto annexed as Exhibit 18. Pursuant to Kentucky and the LJCMG statues and policies, the Defendant Chief Conrad was the Chief of Police on August 10, 2018, and has been granted the powers to regulate the LMPD officer and their conducts and performance in regard to traffic stops, and his powers were not subject to another's review or approval. Moreover, on March 14, 2023, the Defendant Conrad was asked wether he was familiar with the DOJ Report and whether he questioned doubt the findings, he testified that the "Department of Justice knows what they're doing" and that he does not "doubt their findings" Exhibit 11, at 84 - 92: 1 -25.

Based on the video evidences, a reasonable jury could further conclude that Metro Government had notice or constructive notice of these constitutional violations. Moreover, the findings outlined in the DOJ Report sets out that—

> [i]n 2018 and 2019, LMPD's pretextual traffic stops led to complaints from Black residents, widespread media coverage, Metro Council hearings, and court cases. During an August 2018 traffic stop of a Black teenager, which involved at least five officers and a drug-sniffing dog, a detective told the teenager's mother that "we are told by our commanders, by the chief's office" to patrol the"18th Street Corridor, California Park, Victory Park, [and] Park Hill," and "we focus on traffic stops."
> ... That widely publicized encounter and others led to a Metro Council hearing in April 2019, where Chief Conrad defended LMPD's practices.
>
> In late 2018, a state court held that LMPD unlawfully detained a Black man during a traffic stop. The court stated that "citizens driving in west Louisville" should not receive "a lesser degree of constitutional protection," and "protected

activity on one side of town must be deemed protected activity on all sides of town." After the Courier Journal published an article about the case, LMPD opened an investigation. An LMPD investigator criticized the court as "uninformed" and described the court's statement about west Louisville drivers' constitutional rights as "a gratuitous editorial." Nearly two years after the court's decision, LMPD found no policy violations. LMPD's traffic stops of Black drivers were also the subject of several federal civil rights lawsuits, including some that Louisville Metro later settled.

In August 2019, LMPD revised certain policies related to traffic stops. The revised policies do not set clear rules for officers or change enforcement priorities, and LMPD failed to supervise officers and hold them accountable for violating the policies.

Exhibit 6, at p. 47

Therefore, the DOJ Report shows that LJCMG was aware of constitutional violations. So, element one (1) and two (2) of Codrington's custom of-tolerance-or-acquiescence claim has been met.

### b.  Tacit Approval Notice or Constructive Notice on the Part of LJCMG

According to the next element of the custom-of-tolerance-or-acquiescence analysis, a Plaintiff such as Codrington must show that LJCMG's tacit approval of the unconstitutional conduct, said in another way Codrington must show that LJCMG was in fact —deliberate indifference— in their actions by failing to act and that its failure to act amounted to an official policy of inaction.

The DOJ Report found that the "systemic legal violations" that result from Metro Government's pattern or practice of street enforcement are due to "deficient supervision and accountability systems." Exhibit 6, at p. 73. The DOJ Report specifically concluded by supplying a detailed explanation of these deficiencies as follows:

(1) "LMPD fails to adequately support and supervise officers"; (2) "LMPD fails to

investigate and discipline officers for misconduct"; and (3) "Louisville Metro has

failed to provide sufficient external oversight to compensate for these

deficiencies." *Id., at 73 - 82.* (providing a detailed explanation of these

deficiencies)) And the DOJ Report further concluded that "[t]his lack of

accountability allows legal violations to go unchecked."

Exhibit 6, at p. 73.

It is shown that, through this report, LJCMG has ignored such a pattern and allowed the

violations to continue, and that LJCMG was not merely negligent but deliberately indifferent

in its failure to act.

### b. That the LJCMG's Custom was the "Moving Force" or Direct Causal Link in the Constitutional Deprivation Suffered by Codrington

When the final element of a custom-of-tolerance-or-acquiescence claim is address, a

plaintiff such as Codrington must show that LJCMG's custom of tolerating unconstitutional

traffic stops, searches, and seizures "was the 'moving force' or direct causal link in the

constitutional deprivation." *Wallace,* 852 F. App'x at 876 (citing *Doe,* 103 F.3d at 508).

Notice that the DOJ Report shows that Codrington can make such a showing. Exhibit 6.

It is undisputed that Codrington's claims —a black motorist— arise from a traffic stop

conducted by LMPD officers. Moreover, Codrington specifically claim that these officers

violated the Fourth (4th) and Fourteenth (14th) Amendments by: (1) initiating the traffic stop

without probable cause, but we there actions were challenged that attempted to mask it as an

investigation stop; (2) unconstitutionally extending the traffic stop; and (3) conducting an

unlawful search of the vehicle and the driver.

The DOJ Report reached the following conclusions as follows: (l) LMPD officers "routinely violate" the Fourth (4th) Amendment by engaging in "pretextual traffic stops, which LMPD relies on heavily in its street enforcement activities"; (2) LMPD officers engage in "' proactive policing,' where they look for [vehicle] equipment or registration violations. that might generate pretext for a stop"Exhibit 6, at, at p. 32; (3) "LMPD subjects people to unnecessarily intrusive traffic stops" *Id*.; (4) LMPD officers "often reflexively frisk drivers and passengers, even when there is no reason to believe they are armed and dangerous" (id.); (5) LMPD officers "tum frisks into unlawful searches by reaching inside pockets to remove items that could not be mistaken for a weapon and are not immediately incriminating" *Id*., at, at p. 33; (6) "LMPD coerces people into acquiescing to searches instead of obtaining voluntary consent" *Id*.; (7) "during stops LMPD officers repeatedly ask for consent and pressure people into agreeing to searches" *Id.;* and (8) "LMPD officers search cars without probable cause and unreasonably detain people for longer than necessary." *Id*.

Furthermore, the DOJ Report specifically states that:

LMPD coerces people into acquiescing to searches instead of obtaining voluntary consent. If a police officer asks for consent to search, a person has the right to say "no." LMPD officers openly threaten people who exercise this right with the use of drug-sniffing dogs. LMPD training makes this tactic explicit: "During an investigation of a traffic stop," one training states, "the driver of the vehicle can refuse to let the officer search his/her vehicle. This is an important time to know how the K9 Unit can be used." Although using a drug-sniffing dog in this situation is not necessarily unlawful, LMPD officers make this threat in a manner that suggests refusal to consent is futile, even though officers' use of the dog would only justify a lawful vehicle search if the dog identifies evidence of drugs or other contraband from outside the vehicle.

LMPD's systemic Fourth Amendment violations, which often violate LMPD's own policies as well as constitutional limits, reflect an overly aggressive approach to street encounters that harms people. LMPD's training materials encourage this aggressive approach to stops. One training, involving a hypothetical traffic stop, instructs recruits to remove an "argumentative" passenger and a "completely compliant" driver from the car and pat them down. Another training instructs officers that they "should not trust that a suspect is not a threat just because he/she is following your commands," and "the goal is control, and many times control means physically controlling a person."

*Id*., at p. 36.

Thus, this element is met.

Dated: December 12, 2023.

Respectfully Submitted by,

/s/ *Shaun A. Wimberly, Sr.*

Shaun A. Wimberly, Sr.
shaun_wimberly@icloud.com
Wimberly & Associates, PLLC
325 West Main Street
Suite 1816 Waterfront Plaza
Louisville, KY 40202
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing was filed with the Clerk via the Court's ECF/PACER filing system on this 12th day of December, 2023, and a copy of the same was

served via U.S. mail, postage prepaid, on the same said date to the individuals listed below who are not listed as recipients of the ECF/PACER filing system.

Susan K. Rivera
Assistant Jefferson County Attorney
First Trust Centre
200 S. Fifth Street, Cute 300N
Louisville, KY 40202
(502) 574-6312
susan.rivera@louisvilleky.gov
Counsel for Defendants

/s/ *Shaun A. Wimberly, Sr.*

Shaun A. Wimberly, Sr.