UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

KARIM CODRINGTON                                                              Plaintiff

v.                                                        Civil Action No. 3:21-cv-665-RGJ

OFFICER JAY DOLAK, *et al.*                                                 Defendants

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Officer Jay Dolak ("Dolak"), Officer Tyler Blissett ("Blissett"), Officer John Kirk ("Kirk"), Officer Steve Conrad ("Conrad"), and Louisville-Jefferson County Metro Government ("Metro") (collectively, "Defendants") moved for summary judgment. [DE 26]. Plaintiff Karim Codrington ("Codrington") responded, and Defendants replied. [DE 40; DE 43]. Defendants also filed a second motion for summary judgment. [DE 39]. Codrington responded, and Defendants replied. [DE 46; DE 48]. Accordingly, these motions are ripe. For the reasons below, Defendants' motions for summary judgment are **GRANTED**.

I.      **Background**

This action arises from an investigative stop at a Louisville gas station that ended with Codrington's arrest. In August 2018, Codrington parked at a Thornton's gas station at the intersection of 7th Street and Algonquin Parkway. [DE 1 at 6]. The complaint alleges this area "is predominantly black." [*Id.*]. Dolak and Blissett approached in their police cruisers and parked at an angle in front of and behind Codrington's vehicle, blocking him from driving away. [*Id.*]. When asked, Codrington said he had a firearm in his vehicle, and Dolak instructed him to exit the vehicle. [*Id.* at 6–7]. Blissett patted down Codrington, searched his pockets, and told him to move to the rear of the vehicle. [*Id.* at 7]. Codrington provided his driver's license and concealed carry

1

permit. [*Id.*]. Throughout Codrington's interactions with Dolak and Blissett, he repeatedly rebuffed requests to search his vehicle. [*Id.* at 6–7].

Dolak then asked Codrington for proof of insurance but refused to allow him back in the vehicle to produce his insurance card. [*Id.* at 8]. Dolak threatened Codrington with a charge of "Failure to Produce an Insurance Card" if he did not allow officers into the vehicle. [*Id.*]. When Codrington still refused, Kirk—a "K-9 officer" who had arrived on the scene—requested to search the vehicle with his dog. [*Id.*]. Codrington refused again, and Kirk initiated a K-9 sniff of the exterior of the vehicle. [*Id.*]. Kirk then indicated that the dog had alerted, and Codrington was handcuffed. [*Id.* at 8–9]. Dolak and Kirk searched Codrington's vehicle, finding marijuana and a large sum of cash which Codrington now claims totaled $50,000. [*Id.*]. The officers arrested Codrington and transported him to Louisville Metro Department of Corrections. [*Id.* at 9]. Upon arrival, Dolak discovered methamphetamine in the backseat of his police cruiser, which he believed Codrington had concealed on his person. [DE 40 at 302]. Following the arrest, Codrington was charged with loitering, trafficking marijuana, drug paraphernalia, tampering with physical evidence, and possession of a controlled substance. [DE 26-1 at 110; DE 26-6 at 124]. Subsequently, the Jefferson County Circuit Court found there was no reasonable basis for stopping Codrington, no articulable suspicion to justify involving the K-9 unit, and suppressed the evidence discovered in the search. [DE 26-1 at 110; DE 26-6 at 130]. The charges against Codrington were ultimately dismissed. [DE 1 at 11]. Codrington alleges that $18,000 of his $50,000 cash was missing when he sought to retrieve it. [*Id.*].

Codrington further asserts that the alleged police misconduct fits squarely in Louisville Metro Police Department's ("LMPD") policy. [DE 1 at 12]. He cites articles from the Daily Mail, Louisville Insight, WHAS 11, WDRB, the Washington Post, CBS News; several articles from the

Courier-Journal; a report from Hillard Heintze; a Department of Justice press release; and several state and federal court cases involving traffic stops by LMPD. [*Id.* at 12–20]. These date back as early as 2017. [*Id.*].

In his complaint, Codrington raises § 1983 claims for (1) a "*Monell*-related cause of action" for racially motivated traffic stops and failure to train, (2) selective enforcement, (3) unlawful search and seizure, (4) false arrest, (5) malicious prosecution, (6) failure to train, and (7) fabrication of evidence. [*Id.* at 21–35, 43–44]. Additionally, Codrington raises state law claims for (1) battery, (2) false arrest, (3) malicious prosecution, (4) negligent supervision and training, (5) negligence, (6) trespass to property/conversion, and (7) false light. [*Id.* at 35–43].

## II.    Discussion

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The movant has the initial burden to demonstrate the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

### A. Malicious Prosecution, False Arrest, and Fabrication of the Evidence

"If a police officer violates the Constitution, '42 U.S.C. § 1983 provides a civil remedy for those' injured by the violation." *Jackson v. City of Cleveland*, 925 F.3d 793, 813 (6th Cir. 2019) (quoting *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018)). "[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation and citation omitted). To succeed on a § 1983 Fourth Amendment claim for malicious prosecution, a plaintiff must prove that: (1) there was an initiation of a criminal prosecution against him that a defendant either made, influenced, or participated in, (2) there was no probable cause, (3) he

consequently suffered a deprivation of liberty apart from the initial seizure, and (4) the criminal

proceeding was resolved in his favor. *Sykes v. Anderson*, 625 F. 3d 294, 308–09 (6th Cir. 2010).

Similarly, "[i]n order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove

that the police lacked probable cause." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) (quoting

*Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)).

Defendants argue that both the § 1983 and state law claims for false arrest and malicious

prosecution fail because a lack of probable cause is an essential element of both false arrest and

malicious prosecution, and probable cause existed once the marijuana was found in Codrington's

car, and methamphetamine was found in the back seat of Dolak's police cruiser. [DE 26-1 at 112–

17]. Defendants also argue that the "fruit of the poisonous tree doctrine" does not apply to § 1983

actions.[1] [*Id.*]. Codrington responds that there was no probable cause to arrest or charge him for

loitering, and that probable cause was fabricated by planting marijuana and methamphetamine.

---

[1] Although Codrington does not challenge this argument, the Court notes that it agrees. While the "fruit of the poisonous tree" doctrine precludes the government from using evidence acquired during an unconstitutional search and seizure in a criminal prosecution against the victim of the unconstitutional action, *United States v. Calandra*, 414 U.S. 338, 347 (1974), federal courts have widely held that the exclusionary rule and the fruit of the poisonous tree doctrine do not apply to § 1983 actions. *See, e.g.*, *Lingo v. City of Salem*, 832 F.3d 953, 960 (9th Cir. 2016) ("[N]othing within the fruit-of-the-poisonous-tree doctrine suggests that an officer must ignore facts that would give him probable cause to arrest a person merely because those facts were procured through an unlawful search."); *Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016) ("[T]he exclusionary rule does not apply in a civil suit against police officers . . . Accordingly, the officers can rely on the evidence that they found in the [Plaintiffs'] trailer to prove that the arrest warrants were supported by probable cause."); *Townes v. City of New York*, 176 F.3d 138, 146, 148 (2d Cir. 1999) ("In a § 1983 suit . . . [t]he fruit of the poisonous tree doctrine is not available to elongate the chain of causation . . . The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all."); *Martin v. Coyt*, No. 1:10-CV-00176-R, 2012 WL 1574823, at *13, 2012 U.S. Dist. LEXIS 61997, at *36–37 (W.D. Ky. May 3, 2012) (holding that because the Fourth Amendment's exclusionary rule does not apply to § 1983 proceedings "the lack of probable cause to initially arrest and search the plaintiff did not vitiate [the defendant]'s discovery of the pill and the legitimate probable cause to arrest[.]"); *Cobb v. City of Columbus*, No. C-2-99-579, 2000 WL 1621091, at *4 (S.D. Ohio Oct. 20, 2000) (noting that the Sixth Circuit had not yet addressed this issue but finding the Second Circuit's reasoning in *Townes* persuasive and concluding that even if a stop and search were unlawful, the plaintiff's false arrest and false imprisonment claims failed because the drug paraphernalia found justified the defendants' brief detention of the plaintiff to issue him a misdemeanor summons).

[DE 40 at 305–09].

Although the marijuana in Codrington's car was discovered through an unreasonable search, that is immaterial to the Court's analysis because the Fourth Amendment's exclusionary rule does not apply to § 1983 proceedings. As long as the marijuana found in Codrington's car was not fabricated by the officers, they would have had "probable cause for his arrest, notwithstanding the previous unlawful stop . . . [and] the existence of probable cause for the arrest would also bar recovery on a theory of malicious prosecution." *Martin v. Marinez*, 934 F.3d 594, 598–99 (7th Cir. 2019). Dolak and Blissett's body camera footage makes clear that Codrington was not handcuffed until after the K-9 alerted to the presence of narcotics, and he was arrested only after the discovery of the marijuana in conjunction with the large amount of cash and the firearm. Therefore, Codrington's fabrication of evidence claim is inextricably intertwined with the probable cause determination because the presence of drugs was essential for probable cause to arrest him.[2] If there were a genuine dispute of fact as to whether Dolak, Blissett, and Kirk fabricated the marijuana and methamphetamine, as Codrington alleges, there would also be a genuine dispute of fact as to whether there was probable cause to arrest him.[3] The issue then is whether Codrington creates a genuine dispute of fact as to whether the evidence of narcotics was fabricated. *See Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006) (explaining that plaintiff stated a "viable cause of action" for fabrication-of-evidence claim under the Fourth

---

[2] The same is true for qualified immunity because "a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999).

[3] Even if officers only arrested Codrington for loitering, the presence of drugs would still form the basis for probable cause because it would constitute the unlawful activity contemplated by the statute. *See* KRS 524.090(1)(b) ("A person is guilty of loitering when he . . . [l]oiters or remains in a public place for the purpose of unlawfully using a controlled substance.").

Amendment[4] where plaintiff alleged defendant "caused his detention to be unlawfully continued by both fabricating evidence and withholding exculpatory evidence, the absence of either or both of which would have dissolved probable cause for [the p]laintiff's continued detention.").

As the state court's order suppressing the evidence discussed, Dolak, Blissett, and Kirk performed poor police work. [*See* DE 26-6 at 128–30]. The circumstances of the stop were suspicious, starting with the lack of video evidence. For example, Kirk's body camera did not work throughout the entire incident. [DE 40 at 296]. Blissett also turned off his body camera for a period of time while he left the scene to retrieve an evidence bag. [*Id.* at 301]. And despite the fact that Dolak told Codrington his "in-car" camera was recording during the incident and a red light was illuminated on the "in-car" camera, the video from the camera inside Dolak's police cruiser does not exist.[5] [DE 46 at 341, 351–52; Pl. Exhibit 5, at 126:22–126:25].

Additionally, an evidence photo taken after Codrington's arrest shows a handgun and magazine that were not seized from Codrington's car as well as an evidence bag with its label facing downward so its serial number is not visible. [DE 40 at 302, 305; DE 39-7 at 278; DE 39-9 at 287]. Despite Dolak's testimony at the state court that he had provided the prosecuting attorney with the evidence photo, he did not remember who took the evidence photo. [DE 40 at

---

[4] Codrington could only bring a fabrication of the evidence claim under the Fourth Amendment and not the Fourteenth Amendment because he was never tried or convicted on the charges. *See Anderson v. Knox Cnty.*, No. 22-5280, 2023 WL 4536078, at *8 (6th Cir. July 13, 2023) ("Using false evidence to convict violates a defendant's right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause.").
[5] Dolak even testified that he had the recording during a preliminary hearing at the state court and noted on his incident report that there was "IN-CAR VIDEO." [DE 46 at 341, 350; Pl. Exhibit 7, at 00:15:50]. But in his deposition for this case, he said he had not seen the video and had no knowledge of it. [DE 40 at 302; Pl. Exhibit 5, at 251:03–251:06]. The timing of when Dolak turns his in-car camera around is also suspicious. As Codrington points out, he turns the camera toward the back seat while before Codrington is put in the car to be transported, so it is facing away from the scene where officers' interactions with Codrington and his vehicle are taking place. [DE 46 at 351].

302, 304].  He also testified that one of the initial reasons for the stop was to check on Codrington's "wellness"—a justification that appears nowhere else in the record.  [*Id.* at 304].

Dolak and Blissett's body cameras also show some circumstances that could have allowed the officers an opportunity to fabricate evidence.  First, the driver's side door was left open after Codrington exited the vehicle, where the black zipper bag containing marijuana was found on the floorboard.  [DE 40 at 294].  Second, Kirk was out of view of the cameras for certain periods—particularly of note, when he was conducting K-9 sniffs around Codrington's vehicle.  [DE 40 at 298; Pl. Exhibit 4, at 00:14:00–00:16:40].  Third, when Blissett returned to the scene after retrieving an evidence bag, he is seen briefly on Dolak's body camera near the rear of Dolak's police cruiser, which Codrington was transported in after his arrest and where the bag of methamphetamine was found at the police station.  [DE 40 at 301; Pl. Exhibit 4, at 00:44:20].  Taken together, even though the video shows there were potential opportunities to fabricate evidence, it never captures any evidence of officers actually doing so.

And, finally, Codrington highlights certain instances of the officers' behavior that seem unusual or out of place.  For instance, Blissett had a conversation with Kirk via his personal cell phone before Kirk arrived at the scene (instead of communicating through official police channels), and Blissett turned on his body camera after the phone call ended.  [DE 40 at 295–96].  Additionally, the officers can be heard making comments that seemed peculiar or unprofessional throughout the traffic stop, such as stating they found "more weed" when the black zipper bag was discovered, explaining that they "probably found like twenty grand, and a Draco, and some weed, and a paid off car that is about to be ours," and making jokes about being in competition with Jeffersontown police and finding "hashtag Scooby snacks."  [DE 40 at 294, 298, 300, 301; Pl. Exhibit 2, at 00:15:20, 00:29:10; Pl. Exhibit 4, at 01:06:50, 01:25:50].  Again, while some of these

statements may seem irregular, none of them point affirmatively to fabricating evidence. And there are plenty of alternative explanations for why Blissett may have used his cellphone to speak with Kirk other than plotting to steal Codrington's cash—it is not affirmative evidence of a plot to fabricate evidence.

Although the police work here was dubious, there is no affirmative proof that the officers planted narcotics. Defendants highlight facts that undercut Codrington's narrative. First, they point out that Codrington said the marijuana was his girlfriend's, and that it was "handled directly in front of him while the officers discussed the weight and appropriate charge." [DE 43 at 317; Def. Exhibit 1, at 00:15:20]. Codrington's money was also collected and packaged in front of him. [Pl. Exhibit 4, at 00:52:30]. Additionally, Codrington does not dispute that there was a marijuana "grinder" in his vehicle. [DE 43 at 320]. At the beginning of the stop, Dolak also witnessed Codrington throw something into the center console of the vehicle as he approached, and this later turned out to be a spray that could cover the scent of marijuana. [DE 43 at 318–19]. Codrington explained to officers at the scene that it was a spray bottle. [DE 40 at 296]. Defendants also explain that Blissett turned off his body camera because he left the scene to retrieve an evidence bag, which the officers discussed on body camera after realizing no officer on scene had a large enough bag. [DE 43 at 317; Def. Exhibit 2, at 00:39:00–00:39:51]. And, regarding the methamphetamine, Dolak commented to Blissett that Codrington was moving around a lot in the back seat of the cruiser prior to arriving at the police station. [DE 43 at 319].

In sum, Defendants carry their burden as the moving party by showing "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Codrington may have successfully painted a vivid picture of poor police work and a lack of professionalism, but he has produced no evidence that officers planted the marijuana and methamphetamine. *See Anderson*,

477 U.S. at 252 ("[T]here must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."). No officer is ever seen on body camera handling narcotics prior to discovering marijuana in Codrington's car and methamphetamine in Dolak's police cruiser. And during the search of his vehicle, Codrington did not deny that the marijuana was present prior to the stop, only denying that it belonged to him.[6] Codrington also never claims to have personally noticed any officers planting the marijuana or methamphetamine throughout the stop. There simply is no evidence in the record that Codrington could rely on at trial to demonstrate that police officers manufactured probable cause by planting drugs. *See Matsushita*, 475 U.S. at 587 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").

Accordingly, Codrington has not created a genuine dispute of fact as to whether the officers planted the marijuana and methamphetamine. *See Lester v. Roberts*, No. 3:16-CV-119-CHB, 2019 WL 1421755, at *3 (W.D. Ky. Mar. 29, 2019), *aff'd*, 986 F.3d 599 (6th Cir. 2021) (explaining that although an "investigation was not the perfect model of police work," the plaintiff did not "show any . . . fabricated evidence and therefore cannot rebut the presumption of probable cause[.]"). While he successfully marshals the facts to demonstrate that it was *possible* for officers to have planted the drugs, he points to no evidence tending to show that they actually did. That is not enough to survive summary judgment. *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986) ("Evidence suggesting a mere possibility is not enough to get past the summary judgment

---

[6] Codrington did deny that the methamphetamine was his, insisting that officers check it for his DNA. [DE 46 at 359].

stage."); *C.f. Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *abrogated on other grounds by Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (holding that a genuine dispute of fact existed as to whether marijuana was planted to frame a plaintiff when a prison official said "he was going to have [plaintiff] locked up and that would be the end of [plaintiff's] complaints.").

As a result, the Court finds that there is no genuine dispute of fact as to whether the officers lacked probable cause. At best, Codrington has alleged "some metaphysical doubt as to the material facts," but that is insufficient to survive a motion for summary judgment. *Matsushita*, 475 U.S. at 587. For that reason, there is also no genuine dispute as to whether there was probable cause for Codrington's arrest and subsequent prosecution.[7] Therefore, Defendants' motion for summary judgment as to Codrington's claims for fabrication of evidence, false arrest, and malicious prosecution—under both federal and state law[8]—is **GRANTED**.

### B. Remaining Federal Claims

In Kentucky, § 1983 actions are limited by the one-year statute of limitations set forth in KRS 413.140(1). *See Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007); *Collard v. Ky. Bd. Of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990). The Sixth Circuit has explained that "[a]lthough we borrow the statute of limitations for a § 1983 action from state law, we look to federal law to determine when a cause of action accrues and thus when the statutory period begins." *Printup v. Dir., Ohio Dep't of Job & Fam. Servs.*, 654 F. App'x 781, 785 (6th Cir. 2016) (citing *Wallace v.*

---

[7] That is true for all charges brought against Codrington. The presence of drugs and other circumstances of the stop would not only have supported probable cause for the drug-related charges, but also for loitering. *See* KRS 524.090(1)(b) ("A person is guilty of loitering when he . . . [l]oiters or remains in a public place for the purpose of unlawfully using a controlled substance.").

[8] A malicious prosecution claim under Kentucky state law also requires a lack of probable cause. *Estep v. Combs*, 467 F. Supp. 3d 476, 498–99 (E.D. Ky. 2020) (citing *Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016)). Therefore, like Codrington's § 1983 claim for malicious prosecution, his claim under Kentucky state law fails under the second element: that the defendant acted without probable cause.

*Kato*, 549 U.S. 384, 388 (2007)). The "standard rule" is that a cause of action accrues "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace*, 549 U.S. at 388 (internal quotation marks, citations, and alterations omitted). Because an action generally accrues "when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred," courts typically determine the accrual of a § 1983 action by "look[ing] to the event that should have alerted the typical lay person to protect his or her rights." *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (internal quotation marks and citations omitted). "The cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace*, 549 U.S. at 391 (citing 1 C. Corman, *Limitation of Actions* § 7.4.1, pp. 526–27 (1991)) (footnote omitted). As a result, a plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence. *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984) (citing *Briley v. State of California*, 564 F.2d 849, 855 (9th Cir. 1977)) (due diligence standard applied to discovery of fraudulent misrepresentation or concealment of facts in § 1983 action).

Defendants argue all of Codrington's § 1983 claims other than the malicious prosecution claim should be dismissed as untimely because they were not filed within one year after Codrington's arrest. [DE 26-1 at 117–18]. Codrington responds that he "was not aware that he was treated differently from similar[ly] situated individuals in an unprotected class until on or about April 30, 2021 when the United States Department of Justice announced that it ha[d] opened an investigation of the LMPD's practices concerning unconstitutional stops, searches and seizers [sic]." [DE 40 at 310]. In essence, Codrington argues that his claims were timely filed because the statute of limitations began when the Department of Justice announced an investigation into LMPD's practices, not when he was arrested on August 10, 2018. [DE 40 at 310].

### a. Selective Enforcement

Although the Sixth Circuit has not ruled when a cause of action accrues for a Fourteenth Amendment selective enforcement claim, the Third Circuit has provided guidance.  In *Dique v. New Jersey State Police*, the Third Circuit held that "in a case of selective-enforcement we will no longer require that the complainant have been convicted and have had that conviction reversed, expunged or invalidated [as required by *Heck*] . . . the statute of limitations 'beg[an] to run at the time [plaintiff was] detained pursuant to legal process.'" 603 F.3d 181, 188 (3d Cir. 2010) (quoting *Wallace*, 549 U.S. at 397).  The Third Circuit applied a "due diligence" standard, finding that although the statute of limitations did not begin to run when the officer purported to stop his car for a speeding violation, it did begin to run "when his attorney became aware of the extensive documents describing the State's pervasive selective-enforcement practices." *Dique*, 603 F.3d at 188.  Dique's claim accrued when he "discovered, or by exercise of reasonable diligence should have discovered, that he might have a basis for an actionable claim." *Id*.

"Where events receive . . . widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *Hughes v. Vanderbilt Univ*., 215 F.3d 543, 548 (6th Cir. 2000) (quoting *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980)).  In *Hughes*, the Sixth Circuit noted there "had been numerous news reports both in print and on television discussing the facts supporting Hughes's claims." *Id*.  Even though the plaintiff in *Hughes* submitted an affidavit that she personally had not read any newspapers or watched any media coverage, the court held that extensive publicity was sufficient to charge Hughes with constructive knowledge of the events underlying her cause of action. *Id*.

Codrington argues that until the Department of Justice announced it was investigating LMPD's practices in 2021, he personally was not aware that he might have a basis for a claim for

LMPD's alleged selective enforcement based on his race.  [DE 40 at 310].  But the relevant inquiry for discovering the basis of a claim "is an objective one."  *Hughes*, 215 F.3d at 548.  In this case, Codrington had even more reason than the plaintiff in *Dique* to have "discovered, or by exercise of reasonable diligence should have discovered, that he might have a basis for an actionable claim." *Dique*, 603 F.3d at 188.  As Codrington alleges, "during and after the shooting of Breonna Taylor," LMPD had become "famous" for treating African Americans differently because of their race, and this treatment had prompted a "nation wide demand for justice to end discriminatory policing practices by the LMPD[.]"  [DE 1 at 17].  Just as in *Hughes*, this created national media coverage about LMPD's alleged practice of treating African Americans differently because of their race surrounding the March 13, 2020 shooting of Breonna Taylor.[9]  Furthermore, Codrington himself cites in his complaint several news articles between 2017 and 2020, both national and local, that discussed alleged racial disparity in LMPD's practices between white and black citizens.  [DE 1 at 12–20].  Some of these articles even *preceded* his arrest on August 10, 2018.  As such, "[b]ased on the undisputed facts concerning the media attention given [to the basis for an actionable claim], no reasonable factfinder could find" that the one-year statute of limitations had not run by the time Codrington filed his complaint.  *Hughes*, 215 F.3d at 548.  There is no reason to believe Codrington's claim did not accrue more than a year before he filed suit because he had constructive knowledge of it via news coverage in the years immediately following his arrest.  At minimum, Codrington had constructive notice after the death of Breonna Taylor led to a "nation wide demand for justice to end discriminatory policing practices," as the complaint itself alleges.  [DE 1 at 17].

---

[9] Federal courts may take judicial notice of the fact of publicity or media coverage without regard to the truth of their contents. *See*, *e.g.*, *Staehr v. Hartford Fin'l Servs.*, 547 F.3d 406, 425 (2d Cir. 2008); *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 214 (3d Cir. 2007) (taking judicial notice of USA Today and Time Magazine articles submitted by defendants).

That date was more than a year before Codrington filed his complaint.  Accordingly, Codrington's claim for selective enforcement is time barred, and Defendants' motion for summary judgment as to this claim is **GRANTED**.

### b.   Unlawful Search and Seizure

For Codrington's Fourth Amendment claim for unlawful search and seizure, the one-year statute of limitations began to run on August 10, 2018, the date of Codrington's arrest and the alleged illegal search and seizure.  *See Michel v. City of Akron*, 278 F. App'x 477, 479–80 (6th Cir. 2008) (holding that a Fourth Amendment claim under § 1983 begins to run at the time of the search and seizure); *Lovins v. Hurt*, No. 11–216–JBC, 2011 WL 5592771, at *1 (E.D. Ky. Nov. 16, 2011) ("[t]he plaintiffs had reason to know of the injuries they are asserting, the unlawful search and seizure and property deprivation, at the time of the April 22, 2010 search . . . For that reason, the federal constitutional claims related to the April 22, 2010, search will be dismissed[.]").  Because Codrington filed his complaint on November 3, 2021, beyond the one-year statute of limitations, his claim for illegal search and seizure is untimely and Defendant's motion for summary judgment as to this claim is **GRANTED**.

### c.   Failure to Train and Illegal Custom, Practice, and Policy

Codrington asserts *Monell* claims against both Metro and the individual Defendant Officers.  [DE 1 at 21–25].  When the "execution of a government's policy or custom . . .  inflicts the [constitutional] injury," the local government can be held liable under § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  A plaintiff must show that: "1) the [municipality's] training program was inadequate for the tasks that [its employees] must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir.

2019) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)). *Monell* claims allow for municipal liability "'for the constitutional violations of their employees only where the municipality's policy or custom led to the violation' . . . [h]owever, '[t]here can be no liability under *Monell* without an underlying constitutional violation.'" *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023) (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). As outlined above, all of Codrington's constitutional claims are either barred by the statute of limitations or fail as a matter of law. Because a *Monell* claim cannot survive where "the officer inflicted no constitutional harm," *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), Defendants' motion for summary judgment as to Codrington's *Monell* claims for failure to train and illegal custom, practice, and policy is **GRANTED**.

### C. Remaining State Law Claims

#### a. False Arrest and Battery

In Kentucky, the statute of limitations for false arrest and battery is one year. KRS 413.140(1)(a) & (c). State law claims for false arrest and battery arising out of an arrest generally accrue at the time of the arrest. *See Dunn v. Felty*, No.2004–CA–1029–MR, 2005 WL 736596, at *2 (Ky. App. Apr.1, 2005) (unpublished decision). An officer "is liable for false arrest and battery if he lacked reasonable grounds for the arrest, or if the officer had a reasonable basis for the arrest but used more force than was necessary." *Id*. As noted above, there is no genuine dispute as to whether there was probable cause for Codrington's arrest, and so his false arrest claim fails as a matter of law. Even if that were not true, in addition to the battery claim, it would still run afoul of the statute of limitations because Codrington "did not file the action within one year of his arrest." *Id*. As a result, Codrington's claims for both false arrest and battery are time barred, and Defendants' motion for summary judgment as to these claims is **GRANTED**.

16

### b.  Negligent Supervision and Training and Negligence

Like Codrington's other state law claims, Kentucky's one-year statute of limitations governs his state claims for negligence and negligent training/supervision.  KRS 413.140(1); *see, e.g.*, *DeLong v. Arms*, 251 F.R.D. 253, 255 (E.D. Ky. 2008) (one-year Kentucky statute of limitations applies to negligence); *White v. Whitaker Bank, Inc.*, No. 04-CI-05225, 2008 Ky. App. Unpub. LEXIS 95, at *12 (Ky. App. 2008) (citing *Grego v. Meijer, Inc.*, 187 F. Supp. 2d 689, 694 (W.D. Ky. 2001)) ("[T]he statute of limitations to be applied to a negligent supervision claim is the limitations period applicable to the underlying tort committed by the employee.").  "[C]laims "for negligent hiring/entrustment/training/supervision, and negligence, accrue[] when the injury occurred."  *B.L. v. Schuhmann*, 380 F. Supp. 3d 614, 642 (W.D. Ky. 2019).  Codrington alleges his injury arises from his arrest and search, due to the officers' failure to follow "the proper law enforcement policies, procedures, and techniques, and to act as reasonable law enforcement officers would act under the same circumstances[.]"  [DE 1 at 39].  The injury occurred and the one-year statute of limitations began to run on August 10, 2018, the date of Codrington's arrest.  As a result, Codrington's negligent supervision and training and negligence claims are untimely and Defendants' motion for summary judgment as to these claims is **GRANTED**.

### c.  Conversion

"Claims for conversion . . . are governed by the two-year state [sic] of limitations under KRS 413.125."  *Weatherly v. Hospice of Lake Cumberland, Inc.*, No. 2018-CA-000248-MR, 2019 WL 1422848, at *3 (Ky. Ct. App. Mar. 29, 2019).  Meanwhile, trespass to property and trespass to chattel claims are subject to a five-year statute of limitations.  *Id.* at *3–4.  Either way, because the cause of action would have accrued at the time of the conversion or trespass to property—when law enforcement allegedly retained Codrington's money after charges were dismissed against

17

him—neither construction of the claim would be barred by the statute of limitations. *See Bradley v. Nat'l City Bank of Kentucky*, No. 2003-CA-002711-MR, 2004 WL 3017297, at *2 (Ky. Ct. App. Dec. 30, 2004).

But Defendants are still entitled to summary judgment on the merits because Codrington creates no genuine dispute that the officers retained any of the money they seized during his arrest. While the complaint does not make clear whether this claim is one for trespass to property or conversion, the Court construes this claim as a claim for conversion based on the factual allegations. *See Weatherly*, 2019 WL 1422848, at *2 (explaining "it is difficult to see how [plaintiff's] claim of conversion against [defendant] could be characterized as a trespass to property" because "conversion involves consequences which justify the right of the plaintiff to recover the full value of the personal property affected"). Codrington alleges that Defendants outright stole his cash, which amounts to a claim for conversion. The elements of conversion are:

> (1) the plaintiff had legal title to the converted property;
> (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion;
> (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;
> (4) the defendant intended to interfere with the plaintiff's possession;
> (5) the plaintiff made some demand for the property's return which the defendant refused;
> (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and
> (7) the plaintiff suffered damage by the loss of the property.

*C&H Mfg., LLC v. Harlan Cnty. Indus. Dev. Auth., Inc.*, 600 S.W.3d 740, 745 (Ky. App. 2020). During the traffic stop, Codrington only estimated that he had over $10,000 in cash in the vehicle. [DE 39-1 at 246]. Codrington has also produced no bank records to support his assertion that police seized $50,000 in cash during the stop. [*Id.*]. Additionally, body camera video shows that the officers made a point to put Codrington's money into an evidence bag in front of him during

the stop and explained that it would not be counted until it went to a bank until the case was resolved. Codrington's brief affidavit, without more, does not create any genuine dispute of fact that the officer's stole any of his money. [*See* Def. Exhibit 10]. There is no evidence that the $31,958 returned to Codrington when the charges were dismissed was not the full amount. As a result, Codrington cannot establish the basic elements of a conversion claim. Defendants' motion for summary judgment on this claim is **GRANTED**.

### d. False Light

"The cause of action for false light is 'within the tort of invasion of privacy[.]'" *Palmer v. Alvarado*, 561 S.W.3d 367, 371 (Ky. App. 2018) (quoting *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989)). False light requires that "(1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed." *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 888 (Ky. 1981). False light claims have a one-year statute of limitations. *Porter v. Sergent*, No. CV 5:19-455-KKC, 2020 WL 4495465, at *11 (E.D. Ky. Aug. 4, 2020) (citing *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 49 (Ky. 2008)). Kentucky law does not recognize a claim for invasion of privacy based on oral statements. *McCall*, 623 S.W.2d at 887 ("right of privacy does not prohibit . . . statements which are oral"); *Dukes v. Mid- E. Ath. Conf.*, 213 F. Supp. 3d 878, 884 (W.D. Ky. 2016) (granting judgment on the pleadings for the defendant because the false light claim was based on oral statements).

While not explicitly outlined in the complaint, the only written statement that could form the basis of Codrington's false light claim is the police report following the arrest. Codrington states in his complaint that "[t]he Defendants and, through their actions, placed Plaintiff in a false

light to others" and "through their verbal and written statements concerning Plaintiff failed to exercise reasonable care and caution prior to publishing their statements." [DE 1 at 42]. That report was written when Codrington was arrested. [DE 39-2 at 251]. Codrington filed his Complaint on November 3, 2021, well beyond the one-year statute of limitations. As a result, Codrington's claim for false light is untimely and Defendants' motion for summary judgment as to this claim is **GRANTED**.

### III.    Conclusion

For the reasons explained, and the Court being otherwise sufficiently advised, the Court **GRANTS** summary judgment in favor of Defendants on all counts. Accordingly, it is **ORDERED** that:

1.    Summary judgment is **GRANTED** in favor of Defendants on all counts.

2.    The Court will issue a separate final judgment.

Rebecca Grady Jennings, District Judge
United States District Court

April 26, 2024